14 F.3d 833
 62 USLW 2445, 22 Media L. Rep. 1289
 UNITED STATES of America
v.
Robert F. SIMONE, Philadelphia Newspapers, Inc., Intervenor
in D.C.; Legal Communications, Ltd., Proposed
Intervenor in D.C.; Central States
Publishing, Inc., Proposed
Intervenor in D.C.
UNITED STATES of America
v.
Anthony DiSALVO, Philadelphia Newspapers, Inc., Intervenor
in D.C.; Legal Communications, Ltd., Proposed
Intervenor in D.C.; Central States
Publishing, Inc., Proposed
Intervenor in D.C.
Philadelphia Newspapers, Inc., ("PNI") and Legal
Communications, Ltd. and Central States
Publishing, Inc., Appellants in No. 93-1259.
PHILADELPHIA NEWSPAPERS, INC., Legal Communications Ltd. and
Central States Publishing, Inc., Petitioners in No. 93-1260,
v.
UNITED STATES and Robert F. Simone and Anthony DiSalvo, Respondents,
The Honorable James T. Giles, Nominal Respondent.
 Nos. 93-1259 and 93-1260.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 28, 1993.
Decided Jan. 7, 1994.
 
 Michael J. Rotko, U.S. Atty., William S. Lynch, U.S. Dept. of Justice, Louis M. Fischer, David Kris (argued), U.S. Dept. of Justice, Criminal Div., Lynn Panagakos, U.S. Dept. of Justice, Organized Crime & Racketeering Section, Washington, DC, for appellee.
 Samuel E. Klein (argued), Lori Laventhal Marcus, Dechert, Price & Rhoads, Philadelphia, PA, for appellant Philadelphia Newspapers, Inc.
 Mary E. Kohart (rebuttal), Seamus C. Duffy, Michael K. Sullivan, Leslie M. Gillin, Drinker, Biddle & Reath, Philadelphia, PA, for appellants Legal Communications, Ltd. and Central States Pub., Inc.
 Before: ROTH, LEWIS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ROTH, Circuit Judge:
 
 
 1
 This case stems from the trial of Robert F. Simone, who on December 15, 1992, was convicted on five counts of racketeering and extortion. The trial attracted substantial media attention, and following its conclusion one of the jurors claimed that other members of the jury had watched television reports about the case, read newspaper accounts of the trial, and discussed the case with their spouses, despite the court's instruction that they refrain from doing so. These allegations also received substantial media attention. On January 19, 1993, Simone moved the district court to examine the jurors in camera to investigate this alleged misbehavior. The court granted this motion on March 19.
 
 
 2
 Later on March 19, appellant Philadelphia Newspapers, Inc., filed a motion requesting access to the examination of the jury. On March 21, appellants Central States Publishing, Inc., and Legal Communications, Ltd., also filed motions for intervention and access to the hearing. The district court denied these motions on March 22, the date of the hearing. Appellants (referred to herein as "the Newspapers") requested that the proceeding be stayed to enable them to take an expedited appeal to this court. The district court denied the request and proceeded immediately to question the jurors. The Newspapers then filed a Notice of Appeal and an Emergency Motion for Stay and Petition for Writ of Mandamus with this court, as well as a Motion for Expedited Consideration and Summary Reversal. We issued the stay that afternoon. However, upon being notified of the stay, the district court concluded that it had no further need to question the jurors. On April 1, 1993, it entered an order denying Simone's motions for judgment of acquittal, new trial and arrest of judgment. The district court simultaneously released a transcript of the proceedings from which the jurors' names had been removed.
 
 
 3
 We hold that the First Amendment right of access applies to proceedings of this nature. Because we conclude that the district court's findings were inadequate to support closure of the questioning of the jurors and that the release of the transcript of closed proceedings cannot cure restrictions on the right of access absent adequate findings, we will reverse the decision closing the examination of the jury to the press and public.
 
 I.
 
 4
 Simone was tried in the Eastern District of Pennsylvania on RICO, Hobbs Act, and extortionate credit charges based on his attempts to extort money from two prominent Philadelphia-area businesspersons. The trial attracted the interest of the media primarily because Simone, a criminal defense attorney, had in the past represented clients alleged to have had connections to the Philadelphia mob. His defense consisted in large part of allegations that the government was prosecuting him in retaliation for his successful representation of these individuals.
 
 
 5
 Following substantial post-trial publicity concerning claims of juror misbehavior, Simone made his motion for in camera examination of the jury. He alleged that the jurors failed to follow the court's instructions not to read newspaper accounts or watch television news about the trial; that jurors falsely told the judge that they were adhering to his instructions; that the jurors improperly reviewed their trial notes together in violation of the court's instructions; that some jurors had preconceived notions of Simone's guilt; and that the jury felt coerced to reach a verdict. The court granted Simone's motion for examination of the jury. Its order remains under seal.
 
 
 6
 On March 18, 1993, appellant Philadelphia Newspapers, Inc., learned that the court planned to conduct a closed hearing concerning the Simone case on March 22. On March 19, it filed its motion requesting access; its motion was followed two days later by similar motions made by appellants Central States Publishing, Inc., and Legal Communications, Ltd.
 
 
 7
 On the morning of its examination of the jurors, the district court opened the courtroom for a hearing on access. This hearing lasted thirteen minutes. At that time, the court advised counsel that it was going to question the jurors about whether they had been exposed to extraneous materials. It indicated that it had placed its order granting Simone's motion under seal because of its belief that "exposure of the order to the press would subject jurors to coercive influences from the press." The court further indicated that some jurors had reported that the press had contacted them concerning their proposed testimony.
 
 
 8
 The district court denied the Newspapers' motions, concluding that the hearing should be closed because "the presence of the press in the proceedings will be coercive and will interfere with the expressions of candor of the jurors." The district court noted that "[t]o the extent that there is an interest at this point in the proceedings, it is the Government's interest and the defense interest. The public has no outcome interest." The court went on to conclude that, to the extent there was a public interest, it was "far outweighed by the need of the Court and the interest of justice to conduct a hearing in the least coercive atmosphere[, which] requires exclusion of the press." It did not elaborate on precisely why it felt that the presence of the press would be so coercive.
 
 
 9
 The court offered two additional justifications for its decision. First, it likened this situation to one in which it becomes necessary to voir dire the jury before the completion of trial. Second, it was concerned that jurors might "inadvertently speak of" the deliberative process, and reasoned that it was appropriate to close the hearing to protect against disclosure of the deliberative process to the public. The court did indicate that it would release a transcript of the hearings "at an appropriate time, probably within days after the conclusion of the proceedings."
 
 II.
 
 10
 The district court had jurisdiction over the criminal prosecution under 18 U.S.C. Sec. 3231. We have appellate jurisdiction pursuant to 28 U.S.C. Sec. 1291 to review the final order of the district court denying appellants access to the post-trial proceedings. Though it would appear that this case is moot, we find that it falls squarely within that category of cases that are "capable of repetition, yet evading review." See, e.g., Press-Enterprise Co. v. Superior Court of Cal., 478 U.S. 1, 6, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986) [hereinafter Press-Enterprise II ]; United States v. Raffoul, 826 F.2d 218, 222 (3d Cir.1987). In Raffoul this court considered what procedural requirements are necessary to protect the First Amendment right of access when a closure motion is made during the course of a criminal trial. This court noted that "[c]ertainly the press and public will continue to seek access to criminal trials, and within the very short time that closure orders are generally in effect, it is not likely that appellate review would ever be available." Raffoul, 826 F.2d at 222. It is likewise reasonable to assume that the Newspapers will be subjected to this sort of closure order in the future and that, as in this case, appellate review would never be available were review foreclosed by the conclusion of the proceedings prior to the issuance of a stay. Accordingly, we will consider the merits of the appeal.
 
 
 11
 This court has plenary review of whether the district court applied the proper legal principles. Raffoul, 826 F.2d at 222; United States v. Smith, 787 F.2d 111, 113 (3d Cir.1986). With respect to the adequacy of the district court's findings in support of closure and whether the release of the hearing transcript was sufficient to satisfy the First Amendment right of access, this court's scope of review is substantially broader than that for abuse of discretion. "This broader review includes independent consideration of the district court's order and the factual findings inferred from the evidence before it." In re Capital Cities/ABC, Inc., 913 F.2d 89, 92 (3d Cir.1990). See also Smith, 787 F.2d at 113 n. 1 ("In the First Amendment context, reviewing courts have a special obligation that in certain circumstances may require independent review of even factual findings.").
 
 III.
 
 12
 The Supreme Court has developed a two-part test, known as the test of "experience and logic," for determining whether a particular proceeding is one to which the First Amendment right of access attaches. The "experience" prong of the test concerns "whether the place and process have historically been open to the press and general public." Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. at 2740. The "logic" inquiry concerns "whether public access plays a significant positive role in the functioning of the particular process in question." Id.
 
 
 13
 In the line of cases in which it developed this test, the Court has found that the First Amendment right of access attaches to a variety of criminal proceedings, including trials, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 565, 100 S.Ct. 2814, 2821, 65 L.Ed.2d 973 (1980), the voir dire examination of potential jurors, Press-Enterprise Co. v. Superior Court of Cal., 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) [hereinafter Press-Enterprise I ], and preliminary hearings growing out of criminal prosecutions. Press-Enterprise II v. Superior Court of Cal., 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). The Court has also held that a statute requiring the exclusion of the press and public from the courtroom during the testimony of minor victims of sexual offenses violates the First Amendment right of access. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).
 
 A. History
 
 14
 In those cases in which the Supreme Court has considered the First Amendment right of access, it has relied in part on long historical traditions of openness. In Richmond Newspapers it looked back to "the days before the Norman Conquest." 448 U.S. at 565, 100 S.Ct. at 2821. Based on "this unbroken, uncontradicted history, supported by reasons as valid today as in centuries past, we are bound to conclude that a presumption of openness inheres in the very nature of a criminal trial under our system of justice." Id. at 573, 100 S.Ct. at 2825. Similarly, in Press-Enterprise I the Court traced the public selection of jurors back to the 16th century. 464 U.S. at 507, 104 S.Ct. at 822. And in Press-Enterprise II it found a tradition of accessibility to preliminary hearings stretching back at least to the trial of Aaron Burr for treason. 478 U.S. at 10, 106 S.Ct. at 2741.
 
 
 15
 No such rich historical tradition exists with respect to post-trial examinations of jury misconduct. The Newspapers assert that, "[t]o the extent that a post-trial hearing concerning juror misconduct is a 'traditional' proceeding at all, the cases addressing public access to such a proceeding have come down in favor of access." Appellants' Brief at 28. They are unable, however, to support this assertion with anything more than three cases from the Florida state courts, none of which date before 1980. The Newspapers also point to Justice Cardozo's statement in Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), that a juror "will not expect to be shielded against the disclosure of evidence reflecting upon his honor." Id. at 16, 53 S.Ct. at 470. That case, however, concerned whether such evidence is admissible against a juror when she is charged with misconduct. Nothing in the opinion suggests that the disclosure of evidence of a juror's conduct must or can be to anyone other than the trier-of-fact.
 
 
 16
 The United States argues that the broad discretion given to district judges effectively refutes any claim that these hearings have traditionally been held in public. As this court has recently noted, it is well-established that "the trial judge has discretion, both in cases involving intra- and extra-jury misconduct, to decide how to deal with a situation in which there is an allegation of jury misconduct." United States v. Resko, 3 F.3d 684, 690 (3d Cir.1993). This includes the determination whether to hold a post-trial hearing. United States v. Gilsenan, 949 F.2d 90, 96-97 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2971, 119 L.Ed.2d 590 (1992). The Second Circuit has even indicated that district judges have the discretion to decide whether the hearing should be held in camera. United States v. Ianniello, 866 F.2d 540, 544 (2d Cir.1989).[1] We do not, however, find dispositive the fact that trial judges traditionally have had discretion in such matters. The existence of broad discretion to deal with allegations of jury misconduct does not mean that there cannot be areas within the realm of jury misconduct issues to which that discretion does not extend. For example, the scope of a judge's inquiry is limited by Federal Rule of Evidence 606(b), which precludes consideration of the jury's deliberative process. Thus the mere existence of discretion does not, without more, mean that that discretion is not subject to the First Amendment right of access.
 
 
 17
 The United States further contends that the majority of post-trial inquiries into jury misconduct have in fact been conducted in camera, citing United States v. Marrero, 904 F.2d 251, 261-62 (5th Cir.), cert. denied, 498 U.S. 1000, 111 S.Ct. 561, 112 L.Ed.2d 567 (1990); Bolton v. Tesoro Petroleum Corp., 871 F.2d 1266, 1275 (5th Cir.), cert. denied, 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989); United States v. Campbell, 684 F.2d 141, 150 (D.C.Cir.1982); and United States v. Sedigh, 658 F.2d 1010, 1014 (5th Cir.1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982). The United States is quite correct in its assertion that these cases involve in camera post-trial inquiries into jury misconduct. Yet, as precedent they suffer from substantial flaws. First, none of them actually addresses the propriety of holding such hearings in camera. The cases simply mention in providing background that the hearings were held in camera. Second, being of such recent vintage they do not establish a tradition of closure. Given the overwhelming historical support for access in other phases of the criminal process, we are reluctant to presume that the opposite rule applies in this case in the absence of a distinct tradition to the contrary.
 
 
 18
 We conclude that, on the whole, the "experience" prong of the "logic and experience" test provides little guidance in this case. Neither the parties nor this court have been able to find cases dating before 1980 in support of either openness or closure for this type of post-trial proceeding. As such, this case is similar to United States v. Criden, 675 F.2d 550 (3d Cir.1982), in which this court, because it did not believe that historical analysis was relevant to the determination whether the First Amendment right of access applied to pretrial criminal proceedings, focused on "the current role of the first amendment and the societal interests in open pretrial criminal proceedings." Id. at 555. Thus, in making our determination we will rely primarily on the "logic" prong of the test.
 
 B. Logic
 
 19
 This second part of the "experience and logic" test concerns whether public access to a particular proceeding would enhance the functioning of that proceeding. This court has identified six societal interests that the Supreme Court in Richmond Newspapers found were advanced by open court proceedings, namely:
 
 
 20
 promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the judicial system; promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; providing a significant community therapeutic value as an outlet for community concern, hostility and emotion; serving as a check on corrupt practices by exposing the judicial process to public scrutiny; enhancement of the performance of all involved; and discouragement of perjury.
 
 
 21
 United States v. Smith, 787 F.2d at 114 (summarizing Criden, 675 F.2d at 556).
 
 
 22
 On a broad level, we see no reason to suspect that post-trial proceedings as a general category are any different with respect to the First Amendment right of access than the other components of a criminal trial. The Supreme Court has taken care to point out that "the First Amendment question cannot be resolved solely on the label we give the event, i.e., 'trial' or otherwise." Press-Enterprise II, 478 U.S. at 7, 106 S.Ct. at 2740. See also Press-Enterprise I, 464 U.S. at 516, 104 S.Ct. at 827 (Stevens, J., concurring) ("the distinction between trials and other official proceedings is not necessarily dispositive, or even important, in evaluating the First Amendment issues.") Indeed, the Ninth Circuit, speaking through then-Judge Kennedy, has concluded that there is "no principled basis for affording greater confidentiality to post-trial documents and proceedings than is given to pre-trial matters." CBS, Inc. v. United States Dist. Court, 765 F.2d 823, 825 (9th Cir.1985).
 
 
 23
 Nor does there appear to be any policy-based justification for an across-the-board denial of the First Amendment right of access to the more narrow category of post-trial inquiries into jury misconduct. Such proceedings potentially implicate all six of the societal interests recognized in Richmond Newspapers. In particular, public access to such proceedings helps provide the public with the assurance that the system is fair to all concerned. Furthermore, cases in which there are allegations of jury misconduct probably also tend to be those cases in which the public is more likely to be suspicious of other corrupt practices. Opening the judicial process to public scrutiny discourages such practices and assures the public of the integrity of the participants in the system. Finally, public access to such proceedings will in many cases discourage perjury. Members of the public who might be able to contradict the perjured testimony of jurors will not be able to learn of the perjury unless the public and press are given access to these proceedings.
 
 
 24
 We are unpersuaded by the analogy between this situation and the mid-trial voir dire of jurors, which both the district court and the United States have invoked in support of closure. The United States relies primarily on the analysis in United States v. Edwards, 823 F.2d 111 (5th Cir.1987), reh'g denied, 828 F.2d 772, cert. denied, 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988). The Edwards court found that
 
 
 25
 the Supreme Court's test of 'experience and logic' ... leads us, not to a facile answer, but to a quandary: the values of openness are significantly implicated in jury misconduct matters, yet the management of such matters, including control of the place and manner in which 'jury' proceedings are conducted, has historically been subject to the broad discretion of the trial court.
 
 
 26
 Id. at 116-17. Faced with this quandary, the court relied primarily on functional considerations. It found that mid-trial questioning of a jury--in contrast to pre-trial voir dire--has a great potential to pollute the jury as a deliberative body through the introduction of bias and the alienation of sitting jurors. The questioning and defending that takes place in such a proceeding can lead jurors to come to dislike counsel for one side, and sometimes to dislike each other. The court concluded, with little explanation, that "[t]he potentially divisive effects on relationships between jurors would be exacerbated by a 'public hearing.' " Id. at 117. This, it reasoned, would make more likely the possibility of a hung jury, mistrial, or reversal on appeal. Id.
 
 
 27
 Whether or not one accepts the reasoning of the Edwards court, it is apparent that a mid-trial voir dire presents a distinct set of concerns. The court was persuaded by the fact that the jury would have to continue to function as a body after the investigation into misconduct was completed. It felt that publicity would jeopardize the jury's ability to do so. In this case, however, the jury had reached a verdict and no longer needed to function as a body. As a result, the factors that tipped the balance in Edwards are not present. What remains is the Fifth Circuit's observation that "[t]he issue of potential juror misconduct goes to the very heart of public confidence in the fairness or appearance of fairness in judicial proceedings. Once the spectre of a tainted jury is raised, public scrutiny of the resolution of the issue is essential...." Id. at 116.
 
 C. Summary/Conclusion
 
 28
 We hold that the First Amendment right of access attaches to post-trial hearings to investigate jury misconduct. Though experience provides little guidance, logic counsels that access to these proceedings will in general have a positive effect. As this court has recently noted, it is well-established "that when jurors are influenced by the media and other publicity, or when they engage in communications with third parties, these extra-record influences pose a substantial threat to the fairness of the criminal proceeding because the extraneous information completely evades the safeguards of the judicial process." United States v. Resko, 3 F.3d at 690. As a general rule, it would be beneficial for the public to have access to post-trial hearings exploring such extra-record influences. There will, of course, be cases in which public access will interfere with the goals of the criminal justice system. But the First Amendment right of access is not absolute, and the trial court has the power to close the proceedings once it makes findings sufficient to justify closure. Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. at 2740-41.
 
 IV.
 
 29
 Having determined that the First Amendment right of access applies to post-trial examinations of jurors for potential misconduct, we must next consider whether the district court's findings were sufficient to justify restrictions on that right. The Supreme Court has stated the test for restrictions on the right of access as follows:
 
 
 30
 The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
 
 
 31
 Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. at 824. Furthermore, a court must "in a timely manner state its reasons on the record for rejecting alternatives to closure." Criden, 675 F.2d at 561. See also Raffoul, 826 F.2d at 225.
 
 
 32
 As an initial matter, the district court failed to make the required articulation of the "overriding interest" at stake. In this respect this case is similar to United States v. Peters, 754 F.2d 753 (7th Cir.1985). In Peters the district court ordered closure of pre-trial voir dire because it " 'was a little bit chagrined ... that some of the answers of the individual prospective jurors were in the newspaper.' " Id. at 760. The district court did not identify the interest that it felt was being infringed, except for a reference to " 'the integrity of the process.' " Id. at 761. The Seventh Circuit concluded:
 
 
 33
 Because the district court failed to question potential jurors as to their awareness of media coverage of the voir dire, or engage in any other inquiry to support its conclusion that the "integrity of the process" was infected, we find that the court failed to establish a "threat" to the interest in an impartial jury.
 
 
 34
 Id. Similarly, in In re Memphis Pub. Co., 887 F.2d 646 (6th Cir.1989), the Sixth Circuit held "that the naked assertion by the district court in this case that defendant's Sixth Amendment right to a fair trial 'might well be undermined,' without any specific finding of fact to support that conclusion, was insufficient to justify closure." Id. at 648.
 
 
 35
 The trial court's concern with the "coercive" effect of the press suggests that it may have been concerned with preserving the defendant's interest to a fair hearing or perhaps some more generalized interest in truthfulness in these proceedings. That is, it may have felt that the jurors would be more willing to admit that improprieties took place if the press and public were not present. In either case, the court should have stated the position more clearly.
 
 
 36
 Furthermore, we do not believe that a generic concern about the veracity of testimony constitutes sufficient grounds on which to base closure. The Supreme Court refused to accept a similar justification in Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). In that case the Court struck down a Massachusetts statute that required exclusion of the press and public during testimony of minor victims of sexual offenses. The rationale for the statute was that it would encourage more such victims to step forward. The Court refused to accept this justification in the absence of empirical evidence to support it, id. at 609-10, 102 S.Ct. at 2621-22, and also felt that it proved too much in that it could be used in favor of almost any limitation on access. Id. Likewise, in a case such as this the trial court needs to provide specific reasons in support of a conclusion that any effects that the presence of the press and public would have on candor are sufficiently greater than in the run of cases. Such reasoning is distinctly absent from this case.
 
 
 37
 The district court also expressed its concern that the jurors might inadvertently reveal information concerning the jury's deliberative processes. We note, without deciding whether this is a "higher interest" that might justify closure, that its concern was unjustified in this case. The transcript reveals that the court instructed each juror not to discuss the deliberative process and that the jurors had no difficulty following this instruction. In such a case, where the court's concerns about a legitimate threat to an appropriate "higher interest" can be addressed through some mechanism less restrictive than closure, the court must employ that mechanism. Press-Enterprise II, 478 U.S. at 14, 106 S.Ct. at 2743.
 
 
 38
 Even were we to find that the district court sufficiently articulated an "overriding interest" that would be served by closure, we could not conclude that its findings were sufficient to justify closure. Considering when the defendant's interest in a fair trial will override the right of access in the context of preliminary hearings, the Supreme Court held that
 
 
 39
 the preliminary hearing shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights.
 
 
 40
 Press-Enterprise II, 478 U.S. at 14, 106 S.Ct. at 2743. While the trial court in this case alluded to a number of factors that it felt militated in favor of closure, these statements were in the nature of conclusions and offered no insight into why those factors required the hearing to be held in camera. For example, the district judge stated that "the presence of the press will be coercive and will interfere with the expressions of candor of the jurors." No evidence suggested that any of the jurors had indicated that they would feel coerced by the presence of the press. Nor did the judge outline why he felt the situation would be coercive or indicate why he felt that the presence of the press would have a greater effect in this case than it has on any other kind of testimony. The judge's other primary reason in support of closure--that the jurors might have revealed information concerning their deliberations--is equally lacking in the indicia of careful, considered analysis and is unsupported by findings.
 
 
 41
 In sum, the district court's findings do not meet the test set out in Press-Enterprise I, under which it must first clearly articulate the overriding interest that it feels is jeopardized by the presence of the public and press. The court must then, in "findings specific enough that a reviewing court can determine whether the closure order was properly entered," Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. at 824, demonstrate that closure is essential to preserve that interest. Id. It must also indicate why alternatives to closure cannot adequately protect that interest. Raffoul, 826 F.2d at 225. In this case the court pointed to no "higher values" that might be jeopardized by access and offered findings no more specific than a conclusion that jurors would find the presence of the press "coercive" and that it would "interfere with the expressions of candor of the jurors." This is insufficient to justify closure.
 
 V.
 
 42
 We must finally address the United States' contention that the district court's release of the transcript was adequate to cure any unjustified restrictions on the right of access. It relies on the Supreme Court's statement that in some instances "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time...." Press-Enterprise I, 464 U.S. at 512, 104 S.Ct. at 825. It further argues that the examination of the jury was as newsworthy when the transcript was released as it was on the day of the hearing, particularly since the court released the transcript on the same day that it issued its order denying Simone's motions.
 
 
 43
 We do not doubt that the ten day interval between the hearing and the release of the transcript had very little effect on the value of this information as news. But, as the Fourth Circuit has observed, this argument "unduly minimizes, if it does not entirely overlook, the value of 'openness' itself, a value which is threatened whenever immediate access to ongoing proceedings is denied, whatever provision is made for public disclosure." In re Charlotte Observer, 882 F.2d 850, 856 (4th Cir.1989). Furthermore, a transcript is not the equivalent of presence at a proceeding; it does not reflect the numerous verbal and non-verbal cues that aid in the interpretation of meaning. See Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1072 (3d Cir.1984); In re Iowa Freedom of Information Council, 724 F.2d 658, 662-63 (8th Cir.1983). See also Richmond Newspapers, 448 U.S. at 597 n. 22, 100 S.Ct. at 2838 n. 22 (Brennan, J., concurring in the judgment). Thus closure will in many cases effectively prevent the public from receiving information that contributes to the news value of a proceeding.
 
 
 44
 "Therefore, a district court in deciding whether to conduct a proceeding in camera must not relax the standard necessary to close a proceeding simply because a transcript of that closed proceeding can be made available at a later date." Publicker Indus., 733 F.2d at 1072. Because we have found that the district court's findings in this case were insufficient to support closure, we cannot conclude that the release of the transcript afforded adequate access in this case. To do so would relax the standard for closure and would undermine one of the essential aspects of access by permitting public scrutiny of the proceedings only at this later time when, in the eyes of the public, a court might have ascertained that nothing embarrassing to the judicial process would appear in the transcript.
 
 VI.
 
 45
 For the foregoing reasons, we will reverse the March 19, 1993, order of the district court granting Simone's motion for in camera inquiry of individual jurors, and the March 22, 1993, order denying Newspapers' motion for access to the March 22 hearing. We will also remand this matter to the district court to unseal the March 19, 1993, order unless the district court shall determine, and so state, that pursuant to our conclusions stated above good cause still exists to keep this order under seal.
 
 GARTH, Circuit Judge, dissenting:
 
 46
 The narrow issue presented by this case is whether release of a transcript within days of a post-trial in camera interview of jurors satisfies the constitutional values of openness to the public. The majority has said that it does not. See ante at 842. I believe that, to the extent that a right of access exists, it does. Because I am of the view that all First Amendment concerns were met by the delivery of a timely transcript, and that sound constitutional doctrine does not favor expanding constitutional rules beyond that which is required, I am obliged to dissent from the judgment of the majority.
 
 I.
 
 47
 My thesis is a simple one. Even accepting without deciding that there is the same right of access in a post-trial juror interview context as has been held in the trial proceeding itself[1], that access, in my view, has been afforded when a transcript of a post-trial jury interview has been furnished to the press within a reasonable time of the in camera interview. As the Fifth Circuit has observed in the mid-trial jury voir dire context: "[T]he first amendment guarantees a limited right of access to the record of closed proceedings concerning potential jury misconduct and raises a presumption that the transcript of such proceedings will be released within a reasonable time." United States v. Edwards, 823 F.2d 111, 118, reh'g denied sub nom. Times-Picayune Pub. Corp. v. Edwards, 828 F.2d 772 (5th Cir.1987), cert. denied, 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988).
 
 
 48
 Even where the guilt or innocence of the defendant was at stake and had yet to be decided, the Fifth Circuit recognized that no presumption of openness attached to proceedings where the higher value to be served was "in preserving the jury as an impartial, functioning, deliberative body." Id. at 117. In such a circumstance, the Supreme Court has noted that a trial judge may " 'in the interest of the fair administration of justice, impose reasonable limitations on access.' " Press-Enterprise Co. v. Superior Court of Cal., 464 U.S. 501, 511 n. 10, 104 S.Ct. 819, 825 n. 10, 78 L.Ed.2d 629 (1984) ("Press-Enterprise I ") (citations omitted). Here, in the instant case, where the issue of guilt versus innocence has already been determined, the situation, in my opinion, is a fortiori.
 
 
 49
 The concerns that obtain during a trial are far different and more crucial than those that arise in post-trial jury interviews because, as I have stated, no issue of innocence or guilt is hanging in the balance. The majority implicitly recognizes this when it acknowledges that the "mid-trial voir dire presents a distinct set of concerns" than those presented in the post-trial context. Ante at 840. See, e.g., Government of Virgin Islands v. Dowling, 814 F.2d 134, 137-39 (3d Cir.1987) (detailing juror voir dire concerns in trial context); Edwards, 823 F.2d at 117 (same). Notwithstanding this recognition and obvious difference, the majority of this panel rejects the Government's position that the district court's release of the transcript within a reasonable time following a post-verdict voir dire adequately satisfies all First Amendment requirements. The majority premises its decision on the questionable observation that "closure will in many cases effectively prevent the public from receiving information that contributes to the news value of a proceeding." Id. at 842. Yet, it acknowledges that "the ten day interval between the hearing and the release of the transcript had very little effect on the value of this information as news." Ante at 842. The Newspapers themselves do not contend otherwise.
 
 
 50
 The sole argument advanced by the Newspapers for contemporaneous access is that the transcript furnished to them did not suffice because they could not see the judge's expression or the jurors' demeanor. Compare United States v. Smith, 787 F.2d 111, 114-15 (3d Cir.1986). Relying only on this lame explanation, the Newspapers insist that they were denied their constitutional "right of access." In light of the Newspapers' concession that the closure order in this case had a minimal impact on their First Amendment rights, I believe the majority has overstated its position without warrant or reason, and has expanded its First Amendment analysis unnecessarily and in disregard of Supreme Court cautions. It has thereby erred in discounting and ignoring the constitutional value of the release of a transcript in the present context. As the Edwards court held, albeit in the more egregious circumstances of a mid-trial juror inquiry, "the availability of the transcript is the key to satisfying the constitutional values of public scrutiny." 823 F.2d at 118.
 
 II.
 
 51
 In concluding that the district court erred in not permitting the press to attend the post-verdict juror interviews in this case, the majority, in my opinion, has trenched upon traditional doctrine that restricts the formulation of wide-ranging constitutional rules in favor of rules which narrowly prescribe only that which is necessary to resolve the particular question. Thus, this doctrine proscribes expanded and unnecessary First Amendment analysis where alternatives exist. See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. ----, 113 S.Ct. 2217, 2247, 124 L.Ed.2d 472, 516 (1993) (Souter, J., concurring) ("the Court's better practice, one supported by the same principles of restraint that underlie the rule of stare decisis, is not to 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied' ") (citations omitted).
 
 
 52
 I find it difficult to excuse the transgression by the majority in this case because here a ready alternative to the majority's broad rule of contemporaneous access is present. The alternative is the access rule to which I have referred above, i.e., that access in the post-trial juror interview context has been satisfied where a timely transcript has been provided.
 
 
 53
 It is evident that there is no case which has discussed this precise issue in the First Amendment right of access context. The Supreme Court has yet to examine whether there historically has been public access to post-trial proceedings in general. Neither has the Court, nor for that matter has any federal court, held that the press and public have a right of contemporaneous access to in camera post-trial jury interviews. The majority opinion acknowledges this. Ante at 838. The majority further concedes that, unlike the pre-trial jury voir dire situation, "[n]o such rich historical tradition exists with respect to post-trial examinations of jury misconduct," and that such post-trial inquiries traditionally have been conducted in camera. Id. Reasoning that "the overwhelming historical support for access in other phases of the criminal process ... applies in this case," the majority applies the standard of Press Enterprise I for testing "restrictions on the right of access." Ante at 840.
 
 
 54
 What the majority opinion totally ignores is that, even in the trial setting where the issue of guilt or innocence predominates and where the public interest historically is at its peak, this court has recognized that a right of access, if found, need not be contemporaneous access but can be access after the event. For instance, in Smith, 787 F.2d at 114, we recognized that the general principle of openness in criminal trials also applies to evidentiary rulings made during sidebar and chamber conferences that could affect the course of the trial. Because "the public and press may be justifiably excluded from sidebar and chamber conferences," notwithstanding their right of access to an evidentiary or similar ruling, we held in Smith that "that ruling must be available for public review so that the purposes of open trials can be satisfied." Id. As we explained:
 
 
 55
 [I]f there has been no contemporaneous observation, the public interest in observation and comment must be effectuated in the next best possible manner. This is through the common law right of access to judicial records. By inspection of such transcripts, the public, usually through the press, can monitor, observe, and comment upon the activities of the judge and of the judicial process.
 
 
 56
 Id. at 114-15.
 
 
 57
 Although Smith was decided in the context of the common law right of access, its reasoning is equally applicable in deciding the First Amendment issue presented here. See Edwards, 823 F.2d at 118. Trial judges traditionally have had the authority to exercise their discretion in conducting in camera conferences during trial. See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 609 n. 25, 102 S.Ct. 2613, 2621 n. 25, 73 L.Ed.2d 248 (1981); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 598 n. 23, 100 S.Ct. 2814, 2839 n. 23, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring). The First Amendment simply does not mandate "public or press intrusion upon the huddle" at sidebar or in chambers. Id. Whether the openness issue is analyzed in the common law context or under the First Amendment, the underlying question is the same in both instances:
 
 
 58
 "[T]he question in a particular case is whether [closure] is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places."
 
 
 59
 Richmond Newspapers, 448 U.S. at 581-82 n. 18, 100 S.Ct. at 2830 n. 18 (Opinion of Burger, C.J.).
 
 III.
 
 60
 As firmly entrenched as any right of access claimed by the press is the correlative principle that the constitutional right of access is not absolute. Bank of Am. Nat'l Trust v. Hotel Rittenhouse, 800 F.2d 339, 344 (3d Cir.1986). If, as the majority contends, "post-trial proceedings as a general category are [not to be treated] any different with respect to the First Amendment right of access than the other components of a criminal trial," ante at 839 (citing Press-Enterprise Co. v. Superior Court of Cal., 478 U.S. 1, 7, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986) (Press-Enterprise II ); Press-Enterprise I, 464 U.S. at 516, 104 S.Ct. at 827 (Stevens, J., concurring); CBS, Inc. v. United States Dist. Court, 765 F.2d 823, 825 (9th Cir.1985) (Kennedy, J., Opinion)), release of a transcript within a reasonable amount of time following the in camera post-trial questioning of jurors clearly suffices to satisfy any access in the present context.
 
 
 61
 The discretion of trial judges in conducting bench and chambers conferences historically extends to jury matters. Edwards, 823 F.2d at 116; see also United States v. Resko, 3 F.3d 684, 690 (3d Cir.1993) ("the trial judge has discretion, both in cases involving intra- and extra-jury misconduct, to decide how to deal with a situation in which there is an allegation of jury misconduct"); Dowling, 814 F.2d at 137-38 (recognizing trial court's broad discretion in questioning jurors regarding extraneous influence during trial, but expressing preference for individual in camera questioning of possibly-tainted juror). That discretion also extends to the post-trial context of this case. United States v. Ianniello, 866 F.2d 540, 544 (2nd Cir.1989) (noting that district court has absolute discretion to conduct in camera post-verdict inquiry into juror misconduct).
 
 
 62
 In finding a right of contemporaneous access to a post-verdict inquiry into allegations of jury misconduct, the majority errs in misapplying the Supreme Court's analytical framework for accommodating the values served by public access and competing interests. Both Press-Enterprise I and Press-Enterprise II, upon which the majority relies, turned on the question of whether a transcript of closed criminal proceedings must be made available to the public, not on whether the press must be physically present at each and every step of the criminal trial process--and beyond. In Press-Enterprise II, a magistrate judge had excluded the press and public from a forty-one-day preliminary hearing, and refused the press' request for release of a transcript at the conclusion of that proceeding. The Supreme Court found that denying release of the transcript frustrated what it characterized as the " 'community therapeutic value' " of openness. Press-Enterprise II, 478 U.S. at 13, 106 S.Ct. at 2742 (citation omitted). In Press Enterprise I, the press sought release of a transcript of the in camera voir dire of prospective jurors in a rape and murder trial. That request was made only after the jury was empaneled and following six weeks of closed proceedings. The Supreme Court held that:
 
 
 63
 When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time * * *.
 
 
 64
 Press-Enterprise I, 464 U.S. at 512, 104 S.Ct. at 825.
 
 
 65
 The majority acknowledges, and indeed even recites, the above-quoted language of the Supreme Court, see ante at 842, but inexplicably relies instead on a Fourth Circuit case for a contrary result. That case, In re Charlotte Observer, 882 F.2d 850 (4th Cir.1989), is inapposite. There, the Fourth Circuit was confronted with a magistrate's closure order entered on his own motion and issued in lieu of holding a pre-trial jury voir dire. The Fourth Circuit concluded that not only had the magistrate "undervalued the efficacy of jury voir dire as an alternative to the protections that closure might provide," but that the magistrate had failed to appreciate the significance of the underlying First Amendment values. Id. at 856. I note, of course, that the error in In re Charlotte Observer that the Fourth Circuit corrected was an error committed prior to the commencement of trial, whereas here, as even the majority emphasizes, the jury in this case "had reached a verdict and no longer needed to function as a body." See ante at 840. This significant distinction implicates a different and "distinct set of concerns" than those involved in the mid-trial, trial and pre-trial contexts.
 
 
 66
 To me, the teaching of these cases indicates that the public interest in the immediate and contemporaneous access to a post-trial juror interview proceeding, where a transcript is timely provided, is far less significant than is the public interest in either pre-trial or trial proceedings. This must be so because the six societal interests catalogued by this court in United States v. Criden, 675 F.2d 550, 556 (3d Cir.1982) ("Criden II ")[2], which impact on a pre-trial in camera hearing, have little relevance to the type of post-trial proceeding conducted here by Judge Giles. In the post-trial context, even the press itself has recognized that "the media's zeal ... does not center on a concern for litigants' rights to a fair trial, but rather on a desire for human-interest accounts of deliberative proceedings as ends in themselves, written to sell papers." Editorial, First Amendment v. Fair Trial, New Jersey Law Journal, Nov. 22, 1993, at 16 (discussing court-imposed restrictions on post-verdict questioning of jurors by the press).
 
 
 67
 For these reasons, I am not swayed by the majority's argument that a timely transcript is an inadequate substitute for actual presence of the press at a post-trial jury inquiry because "it does not reflect the numerous verbal and non-verbal cues that aid in the interpretation of meaning." Id. at 842. The cases upon which the majority relies for this proposition have no bearing on the constitutional sufficiency of release of a transcript within the very limited situation of an in camera post-verdict jury inquiry. While the text of a transcript may not always provide an adequate substitute for the presence of reporters and the public at trial proceedings, Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1072 (3d Cir.1984), in the unique context of a post-trial jury inquiry, the release of a transcript within a reasonable amount of time provides constitutional access and offends no constitutional requirements.
 
 
 68
 The constitutional values of openness were achieved in this case with the release of a complete transcript ten days following the conclusion of a brief post-trial in camera proceeding. Because the jury decision had already been made and because, in the post-trial context, there is no mandatory constitutional nexus between contemporaneous access and subsequent access, I believe, and the authorities would indicate, that we can satisfy the concerns of openness and fairness by release of a transcript within a reasonable amount of time. See, e.g., Press-Enterprise I, 464 U.S. at 512, 104 S.Ct. at 825; Press-Enterprise II, 478 U.S. at 13, 106 S.Ct. at 2742; cf. Smith, 787 F.2d at 114-15.
 
 IV.
 
 69
 I thus see no reason to conclude that what Judge Giles did in this case was error. We are not dealing here with court-imposed restrictions on what the press may or may not say or do. We are dealing only with a judge's inquiry, triggered by the defendant, to determine whether the jurors had been exposed to extraneous influences during the defendant's criminal trial.
 
 
 70
 Judge Giles conducted a pre-closure hearing at which counsel for the Newspapers was given a meaningful opportunity to argue in favor of a right of access to the post-verdict jury inquiry. At that hearing, the district court judge explained the general nature of the closed proceeding, and also advised counsel for the Newspapers that:
 
 
 71
 The transcript of the proceedings, whatever they are, involving the jurors will be released to the public at an appropriate time, probably within days after the conclusion of the proceedings.
 
 
 72
 [J.A. 28.] In addition, Judge Giles explicitly stated that the court would have "nothing to do about" individual jurors who wished to speak with the press, if they so chose, after the hearing.
 
 
 73
 Because the press and public were not denied access to information about the post-trial proceeding, or in any way inhibited from discussing the testimony given by jurors at the proceeding, I would hold that the district court's release of the transcript satisfied the requirements of the First Amendment, as articulated by the Supreme Court in Press-Enterprise II, Press-Enterprise I, and Globe Newspaper.
 
 V.
 
 74
 That no constitutional harm was incurred by the district court's closure order is underscored by the absence of any real remedy in this case. The majority's reversal of the March 19, 1993 closure order of the district court accomplishes nothing. The hearing is over; the public has been furnished with the transcript of that hearing; First Amendment values have been satisfied. The absence of a remedy is illustrated by the majority's pointless remand "to the district court to unseal the March 19, 1993, order unless the district court shall determine, and so state, that pursuant to our conclusions stated above good cause still exists to keep this order under seal." Ante at 842. I, therefore, see no reason why, in the very narrow context of this case, the majority feels compelled to interpret First Amendment jurisprudence so expansively as to embrace a contemporaneous right of public access "to proceedings of this nature." See id. at 835.
 
 
 75
 For all of these reasons, I respectfully dissent.
 
 
 
 [1]
 Indeed, this court has stated that "[w]here there is a significant possibility that a juror or potential juror has been exposed to prejudicial extra-record information, we have expressed our preference, in general, for individual, in camera questioning of the possibly-tainted juror." Government of Virgin Islands v. Dowling, 814 F.2d 134, 137 (3d Cir.1987). However, Dowling and the five cases it cites for this proposition all involved the mid-trial voir dire of the jury, and thus are distinguishable for reasons that will be discussed more fully below
 
 
 [1]
 While I am not convinced that we must decide that a right of access is essential in a post-trial juror context, I have assumed that right for purposes of this dissent so as to meet the majority analysis on the same playing field. An examination of the district court's reasons for closing its hearing at which it interviewed jurors reveals that the district court took cognizance of the same concerns of bias, misconduct and extraneous influences that were detailed by the Second and Fifth Circuits in United States v. Ianniello, 866 F.2d 540, 543 (2nd Cir.1989) and United States v. Edwards, 823 F.2d 111, 117, reh'g denied sub nom. Times-Picayune Pub. Corp. v. Edwards, 828 F.2d 772 (5th Cir.1987), cert. denied, 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988), where juror interviews were involved. Here, Judge Giles found:
 It is my position that the presence of the press in the proceeding will be coercive and will interfere with the expressions of candor of the jurors. * * *
 [E]ven assuming you have a public interest, that public interest is far outweighed by the need of the court and the interest of justice to conduct a hearing in the least coercive atmosphere and I've determined that that least coercive atmosphere requires the exclusion of the press.
 There's a further reason. Under the rules, a juror may not be questioned about deliberative processes. It is possible that jurors may inadvertently speak of such deliberations and those disclosures are to be protected against--if they're inadvertent disclosures, they're to be protected and I will protect them.
 Thus, the district court, exercising its discretion, determined that the jury voir dire in camera was necessary to safeguard the interests of the Government, the defendant, and the judicial process itself. Certainly these findings were more than sufficient to provide us, as a reviewing court, with the ability to determine the propriety of the closure order. Press-Enterprise Co. v. Superior Court of Cal., 478 U.S. 1, 9-10, 106 S.Ct. 2735, 2740, 92 L.Ed.2d 1 (1986) ("Press-Enterprise II "); Press-Enterprise Co. v. Superior Court of Cal., 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984) ("Press Enterprise I ").
 This being so, I am persuaded that the district court satisfied all applicable standards for a right of access, if we are indeed committed to hold that a right of access obtains in the present context.
 
 
 [2]
 In Criden II, we listed the six societal interests of open court proceedings, identified by members of the Richmond Newspapers Court, as: (1) "promoting informed discussion of governmental affairs by providing the public with a more complete understanding of the judicial system," (2) assuring the public that "the proceedings were conducted fairly to all concerned"; (3) providing a "significant community therapeutic value"; (4) serving as "a check on corrupt practices by exposing the judicial process to public scrutiny, thus discouraging decisions based on secret bias or partiality"; (5) enhancing the performance of all involved: and (6) discouraging perjury. 675 F.2d at 556 (citations and internal quotes omitted)