**Electronically Filed
Supreme Court
SCPW-13-0003250
16-JUL-2014
09:07 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

OAHU PUBLICATIONS INC., dba The Honolulu Star-Advertiser,
a Hawai'i corporation, and KHNL/KGMB, LLC, dba Hawai'i
News Now, a Delaware corporation, Petitioners,

vs.

THE HONORABLE KAREN S.S. AHN, Circuit Court
Judge of the Circuit Court of the First Circuit,
Respondent Judge,

and

THE STATE OF HAWAI'I and CHRISTOPHER DEEDY, Respondents.

_____

SCPW-13-0003250

ORIGINAL PROCEEDING
(CR. NO. 11-1-1647)

JULY 16, 2014

RECKTENWALD, C.J., NAKAYAMA AND POLLACK, JJ.,
CIRCUIT JUDGE BROWNING IN PLACE OF ACOBA, J., RECUSED, AND
CIRCUIT JUDGE KUBO IN PLACE OF McKENNA, J., RECUSED

OPINION OF THE COURT BY POLLACK, J.

This case requires us to address the procedures that a court must undertake to protect the constitutional right of the public to attend criminal trials while also protecting a defendant's potentially countervailing constitutional right to a fair and impartial jury. Additionally, we address the procedures that a court is required to follow before denying public access to a transcript of a closed proceeding.

These important issues arise out of petitions for writs of prohibition and mandamus by Oahu Publications Inc., dba The Honolulu Star-Advertiser (Honolulu Star-Advertiser), and KHNL/KGMB, LLC, dba Hawaii News Now (Hawaii News Now) (collectively, Petitioners). The petitions were filed after the court conducted five separate court proceedings that were not open to the public, and then subsequently sealed the transcript of these court sessions. The relevant proceedings took place on August 26, 2013, during the trial of State v. Deedy, No. 1PC11-1-001647, on the fifth day of jury deliberations. Later on that same day, the circuit court declared a mistrial as a result of a deadlocked jury.

The Petitioners requested two writs. The first, a writ of prohibition, would prohibit the circuit court from enforcing any order sealing portions of the August 26, 2013 proceedings and would order the circuit court to unseal all

transcripts from that date. The second, a writ of mandamus, would prohibit the circuit court from closing the courtroom in a similar manner in a re-trial of State v. Deedy and in any other criminal proceeding.

As explained below, the relief requested by the Petitioners' writ of prohibition was subsequently provided following a remand of the matter to the circuit court; therefore the writ of prohibition is dismissed. We also deny the writ of mandamus that seeks to peremptorily prohibit Judge Karen S.S. Ahn (Judge Ahn) from again closing her courtroom unless specific steps are followed. However, in recognition of the rights and protections declared by the United States Supreme Court and the Hawai'i Constitution, we adopt procedures to guide our courts in the future when making a determination whether to close court proceedings or to deny public access to the transcript of the closed proceeding.

## 1. Factual Background

This original proceeding resulted from court proceedings that were not open to the public and from the sealing of the transcript of those proceedings during the trial of U.S. State Department Special Agent Christopher Deedy (Deedy or the Defendant), who was charged with murder in the second degree for shooting and causing the death of a patron in a fast food restaurant in Waikiki. The trial in the Circuit Court of

the First Circuit (circuit court) was presided over by Judge Ahn and lasted approximately five weeks until a mistrial was declared.  Considerable public attention and media coverage was devoted to the trial.

## A.    The non-public proceedings and sealing of the transcript

On August 26, 2013, during the fifth day of jury deliberations, Judge Ahn held five court proceedings that were not open to the public, with the prosecutor, defense counsel, and Deedy to address matters relating to the jury.  Following the last of these proceedings, the circuit court sealed the portions of the transcript that pertained to these court sessions.  A partial transcript of the August 26, 2013 proceedings, entitled "Partial Transcript of Proceedings," notes the first three proceedings as being "held under seal," with the times indicated:

- "(Proceedings held under seal from 10:35 to 10:48a.m.)"[1]
- "(Proceedings held under seal from 10:49 to 11:11 A.M.)"[2]
- "(Proceedings held under seal from 1:05 p.m. to 1:18 p.m.)".[3]

---

[1]    The minutes on Ho'ohiki indicate that the proceeding was held in chambers, Judge Ahn and counsel had a discussion "re: jury", and the transcript from the proceeding was sealed by the circuit court.

[2]    The minutes on Ho'ohiki indicate that the proceeding was held in the courtroom, Judge Ahn and counsel had a discussion "re: jury", and the transcript from the proceeding was sealed by the circuit court.

[3]    The court's minutes on Ho'ohiki indicate that the proceeding was held via telephone conference in chambers, Judge Ahn and counsel had a discussion "re: jury", and the transcript from the proceeding was sealed by the circuit court.

The partial transcript does not provide any context or background for these three proceedings, but some background information appears regarding the fourth and fifth court sessions.

The fourth proceeding occurred at the bench in the afternoon of August 26, 2013.  Judge Ahn called the case in open court and informed the parties that the jury could not reach a verdict, and the jury did not believe further deliberations would be helpful.

> [Circuit court]: Good afternoon to all of you.  We've received a communication, No. 5, from the jury, and as a matter of record, the -- all other communications were answered with the consent of both counsel, and that communication reads:
>
> We have unanimously voted that the jury does not have a verdict, and that further deliberations will not resolve our impasse.
>
> I propose to bring the jury out, question them about this briefly.  Anything more for the record?
>
> [Defense counsel]:  Yes, Your Honor.  We'd like to be heard on this matter, please.
>
> [Circuit court]:  Yes.
>
> [State]: Your Honor, if Mr. Hart intends to put on the record things that we have discussed which have been sealed, we would request that those same arguments also be sealed.
>
> [Defense counsel]: Well, what I intend to put on the record, and hereby do, is Mr. Deedy's objection to taking a verdict of hopelessly deadlocked at this point, and the reason is that the issues that came up this morning, both in our meeting here in court and on our telephone conference on the record at 1:00, suggest that there is more that the Court can do.

After defense counsel objected to Judge Ahn's proposal to poll the jury about their impasse and the court's intention to

declare the jury deadlocked, Judge Ahn conducted a bench conference with counsel.

> [Circuit court]: All right.  Mr. Hart, why don't you folks approach.
>
> [Defense counsel]: All right.

The bench conference is referenced in the Partial Transcript with the notation "(Proceedings held under seal.)."

At the conclusion of the bench conference, Judge Ahn cleared the courtroom, resulting in a fifth court proceeding that was not open to the public:

> Ladies and gentlemen, thank you for your patience.  At this time, I'm going to ask everyone to leave this courtroom, including the electronic devices.  You can wait right outside.  This is not going to take all afternoon, I hope. All right?  Including the lavaliers, et cetera.

The Petitioners were present in the courtroom at the time it was cleared but did not object to the closure.  After the courtroom was cleared, the partial transcript reflects the notation "(Proceedings held under seal.)."

Later that afternoon, Judge Ahn reopened the courtroom, brought in the jury, polled the jurors regarding their communication that additional time would not permit them to reach a unanimous verdict, and declared a mistrial.

Except for the designation in the partial transcript and in the minutes that the proceedings were sealed, the record does not contain an oral or written order of the court sealing the transcript of the five proceedings.  The record also does

not indicate an objection by Deedy to the courtroom not being open to the public or the sealing of the transcript of these court proceedings.

## B.    The Petition

On September 6, 2013, the Petitioners filed the Petition for Writ of Prohibition and Writ of Mandamus (Petition).  The Petitioners contended that each of the non-public proceedings on August 26, 2013 and the partial sealing of the August 26, 2013 transcript violated their First Amendment rights, and they were entitled to immediate and contemporaneous access to the sealed documents "to serve [their] function as a courtroom monitor for the public."  The Petitioners asked this court to issue a writ of prohibition (1) prohibiting Judge Ahn from enforcing a purported order sealing any portion of the August 26, 2013 trial transcript, and (2) ordering the sealed portion of the August 26, 2013 transcript to be unsealed.  The Petitioners also asked this court to issue a writ of mandamus ordering Judge Ahn to refrain from closing the courtroom and sealing documents in Deedy's re-trial, or in future criminal proceedings, without first providing notice, an opportunity to be heard, and specific factual findings indicating the reason for preventing public access to the proceedings.

On September 20, 2013, this court directed Judge Ahn, the State, and Deedy to answer the Petition.

Judge Ahn responded in her submission to this court that relief by extraordinary writ was not appropriate.  First, Judge Ahn noted that neither the Honolulu Star-Advertiser nor Hawaii News Now objected to the courtroom closure at the time of closure and never moved to unseal any portion of the August 26, 2013 transcript in circuit court.  Second, Judge Ahn contended that the law does not require notice each time a court proceeding is closed.  Judge Ahn further contended that proceedings and communications between a judge and jury during jury deliberations are excepted from the press and the public's presumptive right of access to criminal trials.  Finally, Judge Ahn maintained that this court lacked a full and complete record of the events that transpired in the courtroom to sufficiently address a claim of right of access in the First Amendment context.

The State's answer presented arguments similar to those presented by Judge Ahn.  The State argued that the Petition was premature since relief had not been sought in the circuit court.  Additionally, the State asserted that jury deliberations, including written juror communications, are private and confidential and not subject to public access.  Finally, the State contended that trial courts have discretion to protect the judicial process and ensure that the orderly

operation of court proceedings should not be encumbered in the manner proposed in the Petition.

Deedy filed a joinder to the Petition.

In an order filed October 16, 2013, this court permitted an amicus curiae brief to be filed on behalf of Peer News LLC, dba Civil Beat; LIN Television Corp., dba KHON; Hearst Television, Inc.; Hawai'i Public Radio; Stephens Media LLC, dba Hawai'i Tribune-Herald and dba West Hawai'i Today; Maui Time Productions, Inc., dba Maui Time Weekly; Hawai'i Reporter, Inc.; Hawai'i Professional Chapter, Society of Professional Journalists; Media Council Hawai'i; and The Reporters Committee for Freedom of the Press (collectively, Amici) in support of the Petition.  Amici asked this court, in addition to granting the requested relief, to consider the broad context presented by the Petition and delineate specific procedures to be followed before a trial court may close proceedings in a criminal case.

### C.    Temporary Remand

On January 2, 2014, this court issued an order temporarily remanding the case to the circuit court (Order of Remand).  The Order of Remand directed that the Petitioners file a request with the circuit court seeking access to the sealed portions of the transcript.  The Order of Remand also allowed

for filing of memoranda by the parties, and directed the circuit

court to hold a hearing and file a written ruling.[4]

The Petitioners filed a Motion to Unseal Sealed

Portions of Transcript of August 26, 2013 Proceedings (Motion to

Unseal) on January 13, 2014.  The State filed its response to

the Motion to Unseal on January 21, 2014, and the Petitioners

timely filed a reply.  On January 29, 2014, Deedy filed a

statement of no opposition to the Motion to Unseal.

On February 10, 2014, the circuit court held a hearing

on the Motion to Unseal.  During the hearing, the parties agreed

that Phoenix Newspapers, Inc. v. U.S. Dist. Court for Dist. of

Arizona was the proper test to be applied in determining whether

the sealing of court records is warranted.[5]  The State requested

that, in the event the circuit court released the transcript,

the jurors' names be redacted because of a "chilling affect

(sic) on picking a new jury."  The Petitioners did not object to

---

[4]     The Order of Remand also provided that the record in this case be
supplemented with the transcript of the above-ordered hearing and with all
documents filed in the circuit court in association with the remand.  The
Petitioners were ordered to supplement the record in this case with a
transcript of the August 26, 2013 proceedings, "sealed" or "unsealed" as
ordered by the circuit court.  Upon return of the case to this court, all
parties were provided with the option to file supplemental briefs.  The Order
of Remand specified a timeline for each action.

[5]     In Phoenix Newspapers, Inc. v. U.S. Dist. Court for Dist. of
Arizona, the district court's decision to deny media access to a transcript
of a closed hearing was reviewed by the Ninth Circuit Court of Appeals.  156
F.3d 940, 946-47 (9th Cir. 1998).  The Ninth Circuit held that that a court
must complete procedural and substantive requirements before closing a
hearing and that a transcript of the closed hearing must be released when the
competing interests precipitating hearing closure are no longer viable.

"that singular request," but entered a blanket objection "to the deletion[] of anything else without a full hearing, an opportunity to argue, and full findings and conclusions."  The circuit court indicated that it had not yet made a decision whether to release the transcript, but it would file a written ruling within the 21-day deadline allowed by the Order of Remand.

On February 24, 2014, the circuit court issued an Order Granting in Part and Denying in Part Motion to Unseal Sealed Portions of Transcript of August 26, 2013 Proceedings (Partial Order to Unseal).[6]  The Partial Order to Unseal acknowledged that "the news media have a qualified right of access to judicial proceedings and records."  Further, the order noted that "[a] transcript of any proceedings that have been closed . . . may be released when the danger of prejudice has passed and the factors militating in favor of closure no longer exist."

The Partial Order to Unseal explained the circuit court's actions, indicating the circuit court's "belief that necessary discussions between the [circuit court] and counsel, on the one hand, and deliberating jurors, on the other,

_____

[6]     The Partial Order to Unseal stated "[t]he Court takes judicial notice of the sealed portions of the transcript of the August 26, 2013, proceedings."

traditionally and historically have been closed to the public[.]"

> During these necessarily narrowly tailored discussions, the [circuit court] must avoid intruding upon or inquiring into the jury's deliberations, and must avoid exposing the individual jurors to anything that may in any way improperly influence their continuing decision-making processes.

The circuit court noted that requiring a juror to answer questions in front of family and friends of the Defendant, the alleged victim, and the news media could "expose a juror to pressure and matters which are not part of the evidence to be considered, but it also could hamper the [circuit court's] search for candid answers from that juror." The circuit court noted that privacy and security of the jurors and the importance of preserving an impartial jury to ensure a fair trial on behalf of both a defendant and the State, as the specific reasons supporting the closure:

> For all of these reasons, in order to preserve a juror's privacy and security and the integrity of a fair and impartial jury decision based solely upon the trial evidence and the law provided by the Court, and to protect the right of both parties to a fair trial and verdict, public access would not play a significant positive role in the functioning of this process.

Therefore, the circuit court concluded that because "public access would not play a significant positive role," the closure of the courtroom and denial of public access to the transcript of the closed proceedings was warranted.

The Partial Order to Unseal also recognized that the exigency of the situation had passed and that sealing the transcript was no longer required.

> Now that the initial jury has been discharged, a substantial part of the [circuit court's] . . . concerns no longer apply.

The Partial Order to Unseal released the partially unsealed transcript, noting that the identities of the jurors had been redacted.

### D.    The Unsealed Transcript[7]

The unsealed transcript indicates that on August 26, 2013, during the fifth day of jury deliberations, the circuit court, in five separate instances, conducted court proceedings that were not open to the public to investigate potential juror misconduct.[8]    The first proceeding took place in the judge's

---

[7]     The portions of the transcript that were unsealed by the Partial Order to Unseal were filed with this court on March 11, 2014, along with a copy of the Partial Order to Unseal and the related motion, response, and reply.

[8]     "Juror misconduct" does not necessarily mean a juror's bad faith or malicious motive, but means a violation of, or departure from, an established rule or procedure for production of a valid verdict.  Loving v. Baker's Supermarkets, Inc., 238 Neb. 727, 732 (1991).  In Hawaiʻi, juror misconduct may include bias, prejudice, passion, or misunderstanding of the charge of the court on the part of the jury.  HRS § 635-56 (1993).
    This court has described juror misconduct as any action related to the jury that may result in a denial of a defendant's Sixth Amendment right to a fair trial.

> The sixth amendment to the United States Constitution and article I, section 14 of the Hawaiʻi Constitution guarantee the criminally accused a fair trial by an impartial jury. If any juror was not impartial, a new trial must be granted.  However, not all juror misconduct necessarily dictates the granting of a new trial.  A new trial will not

(continued. . .)

chambers from 10:35 to 10:48 a.m.  The circuit court informed counsel that the jury foreperson had approached her law clerk with a concern regarding another juror.  The court informed the parties that the jury foreperson had asked Judge Ahn's law clerk, "'What do we do if we feel one of the jurors is a friend of one of the sides?'"  The circuit court and the parties discussed how to respond to the foreperson's query.[9]  The court indicated that it would bring the foreperson into the courtroom to

> ask [the foreperson] whether he said something to [the law clerk] this morning and ask him what it was that he asked, let him tell us what his question was, then I'm going to -- I'm going to tell him I cannot -- I don't want to know about your deliberation process or where -- what the jury is thinking about now, or has been thinking about, but can you tell me what you meant.[10]

(Footnote added).  The court also indicated that it would instruct the foreperson not to discuss the questioning with his fellow jurors.

---

[8](. . .continued)
be granted if it can be shown that the jury could not have been influenced by the alleged misconduct.  State v. Kim, 103 Hawaiʻi 285, 290-91, 81 P.3d 1200, 1205-06 (2003) (internal citations and quotations removed).

[9]     The partially-redacted unsealed transcript does not refer to the foreperson by name but does refer to the foreperson using male pronouns.

[10]     The court decided against questioning the foreperson in chambers because the close proximity of the juror to the Defendant could be "intimidating," but had earlier indicated that it did not have a preference whether the questioning took place in court or in chambers.  Judge Ahn stated "I don't care, if you both agree that this [i.e. the courtroom] may be a better setting, that's fine with me."

The circuit court had prepared the courtroom for closure: "We've already kind of put paper over the main doors in the courtroom and the courtroom is locked, and I've contacted public relations with the judiciary and I think she's going to tell the media that they can petition for a writ.[11] The court indicated its awareness that the closure was adverse to the interests of the news media, stating "they know that they can— they're--you know, their relief is through a petition."

This closed proceeding took place in the courtroom from 10:49 to 11:11 a.m. During this session, the circuit court, the State, and defense counsel questioned the foreperson. The foreperson indicated that he was not sure how to bring his concern to the court's attention.

> I just -- I wanted to know if -- like if we -- like if --
> say if I think somebody might be, like, a friend of a
> friend of the -- one of the sides, if, you know, like what
> am I -- am I supposed to say something? Am I supposed to
> bring it up in there?

The court then asked why the foreperson had asked that question. The foreperson related that:

> when we were -- you know, we always line up in the
> hallways, so one day I seen somebody shake somebody's hand
> like they -- they knew them, you know, like, hey, how's it,
> blah-blah-blah. And then -- and then I noticed in the
> courtroom that they were sitting on one side. And then
> when I went to lunch . . . . and I noticed that day that
> that individual was sitting with that -- with the family,
> the person that shook the hand of the juror was -- was
> eating lunch with the family.

---

[11] The record does not indicate whether any media organizations were informed of the closure by judiciary public relations personnel.

The court then allowed counsel to question the foreperson. Defense counsel attempted to ask whether the foreperson had "any sense about whether the juror disclosed any of these knowledges (sic) of the family or friends of the family?" The question was objected to by the State.

The court did not rule on the objection, but in response to the State's objection, the foreperson appears to have volunteered that he took the person with whom the juror shook hands to be a "friend of a friend."

> That's how I took it. I mean, it -- you know what I mean, I -- I didn't -- you know, I didn't see him shake hands with any of the family of either side or -- you know what I mean, it was a -- you know, I just noticed that he shook hands with one person, and it looked like that person was friends of a family.

The foreperson was excused with instructions not to discuss what had just occurred with any other juror. After counsel debated the import of the foreperson's observation, the foreperson was brought back into the courtroom and asked to identify the juror that shook hands with the third party.

The identified juror was then brought to the courtroom and was asked by Judge Ahn, "[D]o you think you can be fair to both sides?" The juror answered "Yes," and Judge Ahn confirmed "So you can be fair to both the government and the defense?" The juror again answered affirmatively. No other questions were asked. After the juror had exited, defense counsel indicated

that the questioning of the juror was insufficient. The circuit court rejected defense counsel's concerns.

During the third proceeding, from 1:05 to 1:18 p.m., the circuit court, defense counsel and the State held a conference in Judge Ahn's chambers regarding the juror's handshake. Defense counsel asked the court to further question the juror because of concerns that the jury would be deadlocked 11-1. "[I]f there, in fact, is going to be a deadlock, the [circuit court] will have to determine whether there is manifest necessity for the dismissal of the juror because they're unable to reach a verdict." Defense counsel suggested that the circuit court needed to get further answers.

> [W]e don't know enough about [the juror] to have a
> confident answer to the question about whether or not [the
> juror] had some undisclosed contact with people close to
> one side or the other that the Court should've known about,
> much the way it inquired of when he promptly and
> responsibly raised his concern during the trial.

The State suggested that the handshake was likely innocuous. Defense counsel replied that

> shaking the hand of a juror while the juror's waiting in
> line is not something we see every day, and further inquiry
> to make sure that we have truly a fair and impartial juror,
> particularly in light of the timing that the jurors
> reported their deadlock . . . suggests the basis for the
> [circuit court] to inquire further. It may turn out to be
> completely innocuous, in which case the record will reflect
> that, or it may turn out to be more[.]

At the end of this session in chambers, the court did not indicate that it would take any specific action.

During the fourth proceeding, counsel and the circuit court had a brief meeting at the bench. Defense counsel again urged the court to make a further investigation into the circumstances of the handshake. Defense counsel also suggested that if the issue was not resolved and the juror was proved not to be fair and impartial, it would present "potential double jeopardy problems of the first order." The State agreed, asking the court to further question the juror. Counsel then debated the scope of the additional questioning of the juror, and the court decided to clear the courtroom.

In this fifth proceeding, the circuit court closed the courtroom and further questioned the juror that shook hands with the third party. The court asked the juror if he remembered shaking hands with anyone while lined up with the jury, and the juror indicated that he did. The juror stated that the person with whom he shook hands was "just one guy I used to work with . . . . I think like almost seven years ago." The juror indicated that the handshake did not "do anything to affect the case or my judgment." The juror was not directly asked if the person with whom he shook hands was identified with the victim or the victim's family, but the juror was asked a question that seemed to imply a relationship between the person with whom he shook hands and with somebody in the case. The question was phrased as follows:

> [Circuit court] Okay. And have you had any -- I just want to ask this as a general question. Have you had any other contacts or -- that -- with anyone who may be -- you think may be associated with anybody in this case or any friends or whatever have you?
>
> [Juror] No, that was pretty much the only person that I've seen, 'cause then from when I leave court here, I usually go straight to my [redacted]'s house and then either pick [redacted] up from work or go straight home.
>
> [Circuit court] Okay.
>
> [Juror] So that was pretty much the only time, besides if we go out eat or something, but besides me actually talking to anybody or something, that was the only person.
>
> [Circuit court] Okay. And after that one incident, did you -- did you see this [redacted] again?
>
> [Juror] I think he was here one other time, but I never talked to him.

The juror was then excused to return to the jury. The State noted that it was satisfied that under the Furutani standard, the juror's conduct did not rise to the level of substantial prejudice.[12] Defense counsel disagreed and took the position that "more searching and further questioning should have been pursued and both sides should have had an opportunity to question [redacted] in a voir dire manner." The record of the five proceedings was then sealed.

The unsealed transcript does not indicate any objection by Deedy to the five court proceedings not being open

---

[12] In State v. Furutani, this court held that a defendant bears the initial burden of making a prima facie showing of a deprivation of the right to a fair trial that could substantially prejudice the defendant, but once a rebuttable presumption of prejudice has been raised, the burden of proving harmlessness is upon the prosecution. 76 Hawai'i 172, 181, 873 P.2d 51, 60 (1994).

to the public or the sealing of the transcript of the proceedings.

### E. Supplemental Briefing

The respondent parties did not file a supplemental brief.

The Petitioners timely filed a Supplemental Brief In Support of Petition for Writ of Prohibition and Writ of Mandamus on March 31, 2014.  In the Supplemental Brief, the Petitioners argue that despite the fact the circuit court unsealed the transcript, "compelling reasons still exist for granting the Petition."  The Petitioners assert that the unsealed August 26, 2013 transcript reveals that "there is no indication that any part of the proceeding . . . should have been performed in camera or that the transcript ever should have been sealed." The Petitioners contend that a "sealing order may only be entered upon a showing of 'extraordinary need' and, furthermore, must be 'narrowly tailored' . . . ."  The Petitioners state that in the present case, "there is no indication of any need, let alone extraordinary need, for closing the proceedings and sealing the transcripts."  The Petitioners assert that:

> the issue at question—whether a single juror had passing contact with a third party member of the public who was never confirmed to be connected to any witness or party— proved to be a trivial one that [the circuit court] apparently concluded would not substantially prejudice the jury deliberations.

Therefore, the Petitioners conclude that there "was no extraordinary need to seal the transcript of those proceedings." The Petitioners contend that the circuit court was required but failed to consider alternatives to closure of the courtroom and sealing the transcript such as redacting jurors' names and other identifying features, which the Petitioners note that the court ultimately did. Lastly, the Petitioners maintain that any legitimate reason to close the courtroom and seal the transcript "vanished as soon as the Deedy trial concluded and the jurors' duty ended."

The Petitioners additionally contend that the release of the transcript by the circuit court did not rectify the underlying harm to the Petitioners. The Petitioners identify the harms as: "the failure of [the circuit court] to provide the Petitioners with notice, an opportunity to be heard, and a detailed explanation of the necessity of closing the courtroom before conducting five closed proceedings and sealing the related portions of the transcript." The Petitioners conclude that "[t]hose harms cannot be remedied by tardy release of the transcript, and this Court can and should exercise its mandamus and prohibitory powers to order [the circuit court] to refrain from future First Amendment violations."

## II. Discussion

Our analysis begins with the rulings of the United States Supreme Court that articulate a qualified public right of access to trial proceedings under the First Amendment. Second, we look to Hawai'i law to determine the extent to which our Constitution and history pronounce similar rights of public access to courtrooms. Third, we examine the minimum procedures that must be observed in order to protect the public's qualified right of access. We then turn to the two concerns precipitated in the current case: whether a public right of access applies to midtrial examination of jurors regarding allegations of misconduct, and under what circumstances the public has a right of access to a transcript of a closed proceeding. As we address each concern, we apply the principles elucidated to protect the right of access of the public to the proceedings that took place on August 26, 2013.[13]

---

[13] Although we ultimately dismiss the writ of prohibition and deny the writ of mandamus, this court has recognized an exception to mootness in cases involving questions that affect the public interest and are capable of repetition but evade review. Okada Trucking Co., Ltd. v. Bd. of Water Supply, 99 Hawai'i 191, 196, 53 P.3d 799, 804 (2002). "Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question." Id. at 196-97, 53 P.3d at 804-05. The phrase "capable of repetition, yet evading review" means that a case will not be moot "where . . . the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit." Id.; see Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 563 (1980) (holding that, "more often than not" criminal trials will be of sufficiently short duration that a closure order will evade review). Here, the likely

(continued. . .)

**A.**

"Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."  U.S. Const. amend I.  "The right to attend criminal trials is implicit in the guarantees of the first amendment."[14]  Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 (1980).  "Of course, this right of access to criminal trials is not explicitly mentioned . . . in the First Amendment."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. 596, 604 (1982).  However, the First Amendment is "broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights."  Id.

The Supreme Court has noted that this qualified right of access is based upon the "two complementary considerations" of "logic and experience."  Press-Enter. Co. v. Superior Court

---

[13](. . .continued)
evasion of full review and the public interest criteria of the public nature of the issue, the likelihood of recurrence, and the desirability of an authoritative determination are demonstrably evident.  Therefore, the instant case falls within the exception to the mootness doctrine and we address the merits of the Petitioners' arguments.

[14]    "[M]any of the advantages of public criminal trials are equally applicable in the civil trial context."  Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 387 n.15 (1979).  "For many centuries, both civil and criminal trials have traditionally been open to the public . . . . While the operation of the judicial process in civil cases is often of interest only to the parties in the litigation, this is not always the case. . . .  Thus, in some civil cases the public interest in access, and the salutary effect of publicity, may be as strong as, or stronger than, in most criminal cases."  Id.

of Cal. for Riverside Cnty., 478 U.S. 1, 8 (1986) (Press-Enterprise II); Globe Newspaper Co., 457 U.S. at 606.  Under the "experience" consideration, a right of the public to attend trials relies on "whether the place and process have historically been open to the press and general public" because a "'tradition of accessibility implies the favorable judgment of experience[.]'"  Press-Enterprise II, 478 U.S. at 8 (quoting Richmond Newspapers, 448 U.S. at 589 (Brennan, J., concurring).  Under the "logic" consideration, the right of the public to attend a criminal proceeding relies on whether "public access plays a significant positive role in the functioning of the particular process in question."  Press-Enterprise II, 478 U.S. at 8.

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known.

Press-Enter. Co. v. Superior Court of Cal., Riverside Cnty., 464 U.S. 501, 508 (1984) (Press-Enterprise I), (citing Richmond Newspapers, 448 U.S. at 569-71).  If a criminal proceeding fulfills the logic and experience considerations, a qualified First Amendment right of access attaches to that proceeding.

The qualified First Amendment right of access has been held by the Supreme Court to attach to criminal trials during the evidence and testimony-taking phase, Richmond Newspapers,

448 U.S. at 580; criminal trials involving minor victims, Globe Newspaper Co., 457 U.S. at 606; voir dire of potential jurors, Press-Enterprise I, 464 U.S. 501, 505 (1984); and the extensive preliminary hearings of the type utilized in California.  Press-Enterprise II, 478 U.S. at 10.

### B.

Similar to the federal constitution, the Hawaiʻi Constitution provides that "[n]o law shall be enacted . . . abridging the freedom of speech or of the press[.]"  Haw. Const. art. I, § 4.  "In interpreting and applying article I, section 4 of the Hawaiʻi Constitution, this court considers the case law established under the [F]irst [A]mendment to the United States Constitution."  In re Haw. Gov't Employees Ass'n, AFSCME, Local 152, AFL-CIO, 116 Hawaiʻi 73, 84, 170 P.3d 324, 335 (2007).  "Effectively, the language of federal and Hawaiʻi constitutional free speech provisions is identical" but "this court may find that the Hawaiʻi Constitution affords greater free speech protection than its federal counterpart."  Crosby v. State Dep't of Budget & Fin., 76 Hawaiʻi 332, 340 n.9, 876 P.2d 1300 n.9 (1994), State v. Rodrigues, 128 Hawaiʻi 200, 203 n.8, 286 P.3d 809, 812 n.8 (2012).  Therefore, article I, section 4 of the Hawaiʻi Constitution encompasses at least as much protection of the right of the public to access criminal trials as has been

found by the United States Supreme Court in the First Amendment to the United States Constitution.

Hawai'i's courts have a long tradition of accessibility by the public; the legal framework utilized by the ali'i transitioned from the kapu system to the use of public trials by jury during the 1820s.[15]  Sally Engle Merry, Colonizing Hawai'i: The Cultural Power of Law 70 (2000).  Queen Lili'uokalani reported that during her trial by a military tribunal in February 1895 the courtroom was "crowded with curious spectators."  Liliuokalani, Hawai'i's Story by Hawai'i's Queen 279 (1990).  The Queen's trial was "open and well attended, and was covered in the daily press."  Jon M. Van Dyke & Paula Henderson, The Trial of Lili'uokalani, in Trial of a Queen: 1895 Military Tribunal (Hawai'i State Judiciary 1996).[16]  Similarly, the "Massie" case, a 1932 high profile murder case that made headlines across the country was attended by a "standing-room-only crowd of spectators."  David Stannard, The Massie case: Injustice and Courage, The Honolulu Advertiser.com (Oct. 14,

---

[15]     The kapu system was an unwritten "traditional code consisting of regulations promulgated by former kings or followed by general consent" that "regulated relations between [the commoners] and the ali'i."  Sally Engle Merry, Colonizing Hawai'i: The Cultural Power of Law 55 (2000).  "Ali'i" means a chief, chiefess, ruler, monarch, or king.  Mary Kawena Pukui & Samuel H. Elbert, Hawaiian Dictionary 20 (1986).  "Kapu" means a taboo or prohibition. Id. at 132.

[16]     Queen Lili'uokalani's trial is reflective of a tradition of public proceedings even though as a military tribunal, it is not a part of the tradition of this court.

2001), http:// the.honoluluadvertiser.com/article/2001/Oct/14/ op/op03a.html (last visited May 1, 2014).

This court has recognized a tradition of public access, declaring it "firmly embedded in our system of jurisprudence" as a "general policy of open trials."  Gannett Pac. Corp. v. Richardson, 59 Haw. 224, 228, 580 P.2d 49, 54 (1978).  Open courts are a fundamental component of our system of law: "[c]ourts are established for the judicial administration of justice.  They are open to the public . . . .  The fact that they are open serves as a safeguard of the integrity of our courts."  State v. Hashimoto, 47 Haw. 185, 200, 389 P.2d 146, 155 (1963).  "The corrective influence of public attendance at trials for crime [i]s . . . important to the liberty of the people."  Territory v. Scharsch, 25 Haw. 429, 436 (1920).  "The words 'public trial' are self-explanatory."  Hashimoto, 47 Haw. at 200, 389 P.2d at 155.  "[A] public trial is a trial at which the public is free to attend."  Scharsch, 25 Haw. at 436.

In Gannett Pac. Corp., we addressed a petition by a local newspaper to prevent the closure of a preliminary hearing in a criminal trial upon a motion by the defendant.  The trial court had granted the defendant's motion to close the preliminary hearing due to concerns regarding the defendant's Sixth Amendment right to a fair trial.  Id. at 236, 580 P.2d at

52. This court prohibited the trial court from closing the hearing. Id. at 226, 580 P.2d at 52.

Gannett Pac. Corp. explicitly recognized a qualified right of access to criminal trial proceedings.

> Whether and to what extent preliminary hearings may be closed to the public is a question of grave import, for it involves not only the right of the accused to be tried by an impartial jury, but it also has a vital relevancy to the right of the public to attend and to be present at judicial proceedings.

Id. at 227, 580 P.2d at 53 (emphasis added). "There will be situations, however, where this right of the public to know must yield to the overriding requirements of due process." Id. at 230, 580 P.2d at 55.

On the same day that Gannett Pac. Corp. was decided, this court also decided Honolulu Advertiser, Inc. v. Takao, 59 Haw. 237, 580 P.2d 58 (1978). The Takao case referred to the decision in Gannett Pac. Corp. and its description of the public right of access. "We are also not here concerned with the public's right to be present and to attend judicial proceedings as we were in [Gannett Pac. Corp.]." Takao, 59 Haw. at 238, 580 P.2d at 60. "In [Gannett Pac. Corp.], we held that except under certain rare and compelling circumstances, courtroom proceedings shall be open to the public." Id. (emphasis added).

The question of whether the First Amendment was implicated in the public right of access was not decided by Gannett Pac. Corp. This court only responded to the question of

whether the press had a unique right of access to public trials, above and beyond that of the public. The court concluded that under the circumstances there was "no such denial" of the "First Amendment right of freedom of the press" because the "closure [of the preliminary hearing] was directed at the public at large and was not limited to the representatives of the news media." Gannett Pac. Corp., 59 Haw. at 229, 580 P.2d at 54 (emphasis added). "The right of media representatives to be present [during court proceedings] is derived from their status as members of the general public . . . they occupy no privileged position vis-a-vis the general public." Gannett Pac. Corp., 59 Haw. at 229-30, 580 P.2d at 54-55.

Therefore, Gannett Pac. Corp.'s holding regarding a right of access to criminal trials as derived from the First Amendment is limited to a determination that the press does not have a unique First Amendment right of access beyond that held by the general public.[17] However, to the extent that Gannett

---

[17] The court in Gannett Pac. Corp. based its finding of "no . . . denial" of a First Amendment right on the priority of the Sixth Amendment right to a fair trial by an impartial jury over the general policy of openness. Gannett Pac. Corp., 59 Haw. at 232, 580 P.2d at 56 ("The right to trial by an impartial jury is fundamental."). The court found the issue of closure was best left to the discretion of the court to balance the defendant's right to a fair trial with "this jurisdiction's policy of openness in judicial proceedings." Id. at 233, 580 P.2d at 56-57. "The fundamentals of a fair trial ought to require no less than that highly prejudicial information, which would not be admissible at trial, should be kept, if possible, from the eyes and ears of prospective jurors." Id. This court found that in order to close a courtroom, the presiding judge must find that there is a "substantial likelihood that an open hearing . . . would interfere with the defendant's right to a fair trial by an impartial jury."
(continued. . .)

Pac. Corp. declined to expressly recognize the public's right of access in terms of the protection of the First Amendment, this restricted application has been superseded by the decisions of the United States Supreme Court. We have already noted the significant tradition in Hawai'i of maintaining open court proceedings. Furthermore, the benefits identified by the Supreme Court under the "logic" prong as to the significant positive role played by public access is equally applicable in Hawai'i. See Press-Enterprise II, 478 U.S. at 8; Press-Enterprise I, 464 U.S. at 508. Therefore, we hold that article 1, section 4 of the Hawai'i Constitution provides the public with a qualified right of access to observe court proceedings in criminal trials.[18]

---

[17](. . .continued)
Id. at 233, 580 P.2d at 56-57 (emphasis added). To determine whether the likelihood was substantial

> the district judge shall consider [1] the nature of the evidence sought to be presented; [2] the probability of such information reaching potential jurors; [3] the likely prejudicial impact of this information upon prospective veniremen; and [4] the availability and efficacy of alternative means to neutralize the effect of such disclosures.

Id. at 233-34, 580 P.2d at 57. This court then found that "[j]udged by the standards we have established, however, there was an insufficient basis for [the trial court's] closure order." Id. at 235, 580 P.2d at 58.

[18] "[T]he reasons underlying openness in the criminal context, as enunciated in [Gannett Pac. Corp.], are equally compelling in the civil context." In re Estate of Campbell, 106 Hawai'i 453, 462, 106 P.3d 1096, 1105 (2005).

## C.

"Although the [First Amendment] right of access to criminal trials is of constitutional stature, it is not absolute." Globe Newspaper Co., 457 U.S. at 606. Exceptions to the general rule presuming openness of criminal trials must be limited and to preserve compelling interests. "Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness." Press-Enterprise I, 464 U.S. at 501. "[T]he circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one." Globe Newspaper Co., 457 U.S. at 606.

Therefore, the qualified right of public access provided by the First Amendment and article 1, section 4 can be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press-Enterprise I, 464 U.S. at 510 (emphasis added); Press-Enterprise II, 478 U.S. at 9-10; see also Globe Newspaper Co., 457 U.S. at 606-07 ("Where . . . the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest"). The trial court must articulate the interest the

closure protects, "along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." Press-Enterprise I, 464 U.S. at 510; Press-Enterprise II, 478 U.S. at 10.

Additionally, if the court is contemplating whether closure of the courtroom is necessary, it must provide a reasonable opportunity for the public to object. "[T]he press and the general public must be given an opportunity to be heard on the question of their exclusion." Globe Newspaper Co., 457 U.S. at 609 n.25 (citing Gannett Co., 443 U.S. at 401 (Powell, J., concurring)). The requirement of notice continues to apply when the compelling interest asserted is protection of the defendant's Sixth Amendment right to a fair trial by an impartial jury. United States v. Brooklier, 685 F.2d 1162, 1168 (9th Cir. 1982); see also ABC, Inc. v. Stewart, 360 F.3d 90, 95 (2d Cir. 2004) (noting that no notice had been provided before closure of voir dire in jury selection); In re S.C. Press Ass'n, 946 F.2d 1037, 1040 (4th Cir. 1991).

The United States Supreme Court has not explicated a standard for notice. However, individual notice may be practicable under certain circumstances.

> Without adopting an inflexible rule, we believe that where a closure motion is not filed of record or made in open court, and when, as here, the court has been made aware of the desire of specific members of the public to be present, reasonable steps should be taken to afford such persons an

> opportunity to submit their views to the court before
> exclusion is accomplished. [19]

United States v. Brooklier, 685 F.2d 1162, 1168 (9th Cir. 1982)

(footnote added).[20]

If objections are made by those "actually present,"

the trial proceedings should be conducted to allow those

objecting to removal to be heard before a closure order is

entered.  United States v. Raffoul, 826 F.2d 218, 226 (3d Cir.

1987).  Further, the courtroom shall not be closed except upon

the court's order.  Id.  Written motions for closure should be

docketed immediately.  Id.  Motions for closure made outside the

public's hearing should be renewed in open court before being

acted upon.  Id.

---

[19]    To the extent practicable, a reasonable attempt should be made to notify entities or persons who have requested "Extended Coverage" of a case. Extended Coverage means any recording or broadcasting of proceedings through the use of television, radio, photographic, or recording equipment by the media or on behalf of educational institutions.  Rules of the Supreme Court of the State of Hawai'i (RSCH), Rule 5.1(c).  Any person may request the court to allow Extended Coverage.  RSCH Rule 5.1(e).  That rule designates that "[w]hen more than one media representative requests extended coverage . . ., the media collectively shall designate one representative to work with the coordinator," which may facilitate providing notice when contemplating closure.  RSCH Rule 5.1(e)(5).

[20]    But see Application of The Herald Co., 734 F.2d 93, 103 (2d Cir. 1984) (noting Brooklier, but holding that general public notice suffices to afford an adequate opportunity to challenge a courtroom closure); Crowe v. Cnty. of San Diego, 210 F. Supp. 2d 1189, 1191 (S.D. Cal. 2002) (noting Brooklier, but declining to provide special notice to the press because the court could see no reason why certain media organizations deserved special notice and docket entry was reasonable);  NBC Subsidiary (KNBC-TV), Inc. v. Superior Court, 20 Cal. 4th 1178, 1217, 980 P.2d 337, 364-65 (1999) (noting Brooklier, but holding that adequate notice of the contemplated closure is provided if the trial judge announces in open court that he or she plans to hold or to consider holding a proceeding in closed session or when a motion seeking closure is made in a written filing that is publicly docketed reasonably in advance of a determination hearing).

The requirements that must be satisfied by a court in order to overcome the qualified right of the public to access criminal trials may be divided into procedural and substantive elements. Oregonian Pub. Co. v. U.S. Dist. Court for Dist. of Or., 920 F.2d 1462, 1466 (9th Cir. 1990). The "procedural prerequisites to entry of an order closing a criminal proceeding to the public [are] (1) those excluded from the proceeding must be afforded a reasonable opportunity to state their objections; and (2) the reasons supporting closure must be articulated in findings." Brooklier, 685 F.2d at 1167-68. The substantive reasons that must be found and included in the findings are: "(1) [the] closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." Oregonian Pub., 920 F.2d at 1466 (citing Press-Enterprise II, 478 U.S. at 13-14).

The procedural and substantive safeguards of the public's right of access "are not mere punctilios, to be observed when convenient." Phoenix Newspapers, Inc. v. U.S. Dist. Court for Dist. of Ariz., 156 F.3d 940, 951 (9th Cir. 1998). Those safeguards

> provide the essential, indeed only, means by which the public's voice can be heard. All too often, parties to the litigation are either indifferent or antipathetic to disclosure requests. This is to be expected: it is not

> their charge to represent the rights of others.  However, balancing interests cannot be performed in a vacuum.  <u>Thus, providing the public notice and an opportunity to be heard ensures that the trial court will have a true opportunity to weigh the legitimate concerns of all those affected by a closure decision</u>.  Similarly, entry of specific findings allows fair assessment of the trial judge's reasoning by the public and the appellate courts, enhancing trust in the judicial process and minimizing fear that justice is being administered clandestinely.

<u>Id.</u> (emphasis added).  The procedural protections of the First Amendment and article 1, section 4 right of access to criminal procedures are critical to inform the affected party, i.e. the public, that their rights are in imminent danger.  Therefore, the standards promulgated by the United States Supreme Court place the responsibility on the trial court to provide notice that a compelling interest may necessitate closure of a proceeding, and afford an opportunity for the public to be heard.  Requiring specific findings on the record enables the trial court to address each element necessary for closure and allows an appellate court to review the reasoning of the trial judge to ensure that protection of the public right was adequately considered.

**D.**

In determining whether a constitutional right of access is applicable to a particular portion of a trial proceeding not yet decided by the Supreme Court, courts have examined whether experience and logic indicate that the proceeding should be open.  Once such a right is implicated, any

closure or limitation of access must demonstrate compliance with the prescribed procedural and substantive requirements.  We first address the midtrial examination of jurors, and second, the sealing of a transcript of closed proceedings.

**1.**

When the proceeding at question is, as in this case, the examination of jurors during a criminal trial in order to investigate potential juror misconduct, the defendant's Sixth Amendment right to an impartial jury may be implicated and may conflict with the right of access of the public.  "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]"  U.S. Const. Amend. VI.  The Hawai'i Constitution provides similar protection: "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the district wherein the crime shall have been committed[.]  Haw. Const. art. I, § 14.

The conflict between the public's right of access and the defendant's Sixth Amendment right to a fair trial by an impartial jury arises because in contrast to the benefits of open trials, jury deliberations require privacy.  It is a "cardinal principle that the deliberations of the jury shall remain private and secret[.]"  United States v. Olano, 507 U.S.

725, 737 (1993). "[P]ublic policy demands that the sanctity of jury deliberations be vigorously guarded to ensure frankness and open discussion." State v. Kim, 103 Hawai'i 285, 292, 81 P.3d 1200, 1207 (2003).

The purpose for providing secret deliberations is to ensure the impartiality of the jury. The Supreme Court "has long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial." Gannett Co., 443 U.S. at 378.

> Compelling governmental interest in the integrity of jury deliberation requires that the privacy of such deliberations and communications dealing with them be preserved. Confidentiality is a shield against external considerations entering into the deliberative process. Such a shield prevents undermining of the integrity of the jury system. Juries must be permitted to deliberate fully and freely, unhampered by the pressures and extraneous influences which could result from access by the press to the deliberative process.

United States v. Gurney, 558 F.2d 1202, 1210-11 (5th Cir. 1977) (emphasis added).

The right to a trial by an impartial jury is fundamental. Gannett Pac. Corp., 59 Haw. at 232, 580 P.2d at 56. Where a defendant's right to an impartial jury may be compromised by the possibility of external interference with jury deliberations or juror misconduct, the court has a duty to act.

> Where the trial court determines that the juror misconduct could substantially prejudice the defendant's right to a fair and impartial jury, a rebuttable presumption of prejudice is raised and the court must investigate the

> totality of circumstances to determine if the misconduct
> impacted the jury's impartiality.

State v. Yamada, 108 Hawai'i 474, 479, 122 P.3d 254, 259 (2005) (emphasis added). When a court investigates allegations of juror misconduct pursuant to its duty to protect a defendant's right to an impartial jury, its actions constitute trial proceedings, and rights of public access under the First Amendment and article 1, section 4 may attach. See Richmond Newspapers, 448 U.S. at 580 (holding that the right to attend criminal trials is implicit in the guarantees of the First Amendment). Therefore, that right of public access to observe criminal trials is potentially in conflict with the policy of protecting the integrity of jury deliberations in furtherance of a defendant's right to an impartial jury. Thus, we must examine if considerations of tradition and logic provide a qualified First Amendment right of public access to midtrial examination of jurors to investigate potential juror misconduct.

### a.

There is no clear tradition of closing a courtroom in Hawai'i to conduct midtrial examination of jurors in order to investigate juror misconduct. No Hawai'i case has ever upheld the closure of a court proceeding during trial.[21] Closure has

---

[21] But cf. State v. Swanson, 112 Hawai'i 343, 355, 145 P.3d 886, 898 (App. 2006) (concluding that defendant's constitutional rights to a public trial were not implicated when the jury returned its verdict after normal

(continued. . .)

been invalidated based on various grounds.  See Gannett Pac.
Corp., 59 Haw. at 235, 580 P.2d at 58; State v. Ortiz, 91 Hawai'i
181, 981 P.2d 1127 (1999) (holding that when a defendant invokes
his Sixth Amendment right to a public trial, the court may only
close the courtroom under the strict test set forth in Waller v.
Georgia, 467 U.S. 39 (1984))[22]; In re Estate of Campbell, 106
Hawai'i 453, 454, 106 P.3d 1096, 1097 (2005) (holding that a
common law presumption of judicial openness accompanies probate
proceedings that may be overcome only upon a showing of strong
countervailing reasons that outweigh the public's presumptive
right of access to court proceedings and records).  Furthermore,

---

[21](. . .continued)
business hours, when the courthouse was closed to the public, because the
closure was too trivial to implicate the constitutional guarantees); Freitas
v. Admin. Dir. of Courts, 104 Hawai'i 483, 486, 92 P.3d 993, 996 (2004)
(declining to extend First Amendment rights of access to administrative
hearings).

[22]    In Waller, the Supreme Court considered the extent of the
accused's Sixth Amendment rights at trial.  Waller, 469 U.S. at 44.  Waller
states that "the right to an open trial may give way in certain cases to
other rights or interests[.]"  Id. at 45.  Based on Press-Enterprise I,
Waller articulated a four-part test:

> [1] the party seeking to close the hearing must advance an
> overriding interest that is likely to be prejudiced, [2]
> the closure must be no broader than necessary to protect
> that interest, [3] the trial court must consider reasonable
> alternatives to closing the proceeding, [4] and it must
> make findings adequate to support the closure.

Id. at 48.  In Ortiz, this court addressed the necessary evaluation a court
must apply when a defendant objects to closure of courtroom proceedings that
a court deems may be necessary to protect a defendant's Sixth Amendment
rights.  Ortiz adopted Waller's four-part test and applied it to determine
whether the courtroom was properly closed to the defendant's relatives and
girlfriend over the defendant's objection.  Ortiz, 91 Hawai'i at 191, 981 P.2d
at 1137.  This court found that the trial court's actions had violated the
defendant's right to a public trial.  Id. at 193, 981 P.2d 1139.

no Hawai'i case involving individualized voir dire of jurors;
that is, examination of jurors outside the presence of the other
jurors, contains any indication that the voir dire was conducted
in closed proceedings.[23]

The Fifth Circuit Court of Appeals has held that a
court may close a courtroom without a pre-closure hearing for
midtrial examination of jurors regarding misconduct. U.S. v.
Edwards, 823 F.2d 111, 117 (5th Cir. 1987) (discussed infra).
However, that case explicitly relied on "functional
consideration[s] for an answer" rather than historical
precedent.[24] Id. at 117. Additionally, in the past quarter-
century since Edwards was decided, few cases have relied upon
its approach.

One such case is State v. Halverson, 309 P.3d 795
(Wash. Ct. App. 2013), where the trial court questioned a juror
"in chambers, off the record," during deliberations without the
presence of the defendant. Halverson, 309 P.3d at 796. The
decision in Halverson upheld in camera examination of jurors
outside of the defendant's presence based on "historical

---

[23]   See State v. Ho, 131 Hawai'i 59, 314 P.3d 849 (App. 2013); State
v. Keohokapu, 127 Hawai'i 91, 95, 276 P.3d 660, 664 (2012); State v. Mark, 120
Hawai'i 499, 521, 210 P.3d 22, 44 (App. 2009); State v. Pauline, 100 Hawai'i
356, 369, 60 P.3d 306, 319 (2002); Ortiz, 91 Hawai'i at 186, 981 P.2d at 1132.

[24]   Edwards does not define "functional," but the court examined the
deliberative process and hypothesized how open proceedings could disrupt that
process. Edwards, 823 F.2d at 117. Therefore, in this context "functional"
means the operations or process of a working jury.

practices in Washington" and reliance upon Edwards.  Id. at 797-98.  However, Halverson represents a significantly different historical tradition than that of Hawai'i, as our law does not allow a judge to question a juror about potential misconduct without the defendant present.  State v. Estrada, 69 Haw. 204, 226, 738 P.2d 812, 827-28 (1987) (holding that the judge's ex parte entry into the jury room and extended explanations in response to jury questions was improper).[25]  A defendant in a criminal case has a procedural and constitutional right to be present whenever the court communicates with the jury.  State v. Pokini, 55 Haw. 640, 651, 526 P.2d 94, 105 (1974).

We also note that the Ninth Circuit permitted closure of a courtroom in order to address jurors' concerns regarding their safety due to the attendance at the trial of some "intimidating" individuals.  United States v. Ivester, 316 F.3d 955, 960 (9th Cir. 2003).  The Ivester court first noted that "[h]ad the district court decided to question [the juror] in chambers without the defendant or spectators, we would conclude that there were no constitutional violations," id. at 959, which, as noted, is contrary to our law.  Additionally, the

_____

[25]     The Estrada court exercised its supervisory powers to declare a judge's practice of personally entering the jury room to answer the jurors' questions improper and prejudicial.  Estrada, 69 Haw. at 228, 738 P.2d at 828.  "In either a criminal or civil context, defendants are entitled to a fair and impartial jury trial free from prejudicial ex parte influences."  Id.

court characterized the assurances made to the jury in the closed courtroom not as a constitutional concern but as an administrative matter: "questioning the jurors to determine whether they felt safe is an administrative jury problem." Id. at 960. Thus, a significant reason Ivester found no constitutional violation in the closure of the courtroom was because juror misconduct was not at issue, and the defendant's right to a fair trial was not implicated. Id. Ivester does not hold that the examination of a juror concerning a fair trial may be addressed outside the presence of the public.[26] Id.

Therefore, Edwards and the few cases that rely on its holding provide weak support for a tradition of closing courtroom proceedings to conduct midtrial examination of jurors to investigate potential juror misconduct.[27]

---

[26] Matters directly impacting the security or safety of jurors might appropriately be addressed in closed proceedings, but only where revealing the information publicly could frustrate efforts to protect jurors, and a transcript of the proceeding remains sealed only for so long as necessary. See section II.D.2, infra.

[27] The Third Circuit has expressed a "general" preference, for individual, in camera, questioning of a possibly-tainted juror, "[w]here there is a significant possibility that a juror or potential juror has been exposed to prejudicial extra-record information." Gov't of V.I. v. Dowling, 814 F.2d 134, 137 (3d Cir. 1987) (declining to find error in the en banc examination of jurors regarding potential misconduct). However, the cases cited by Dowling do not discuss the issue of public access to midtrial examination of jurors. See United States ex rel. Doggett v. Yeager, 472 F.2d 229, 239 (3d Cir. 1973) (reversing a finding of no prejudice to the defendant by external information in part because the court examined jurors as a panel rather than individually); United States v. D'Andrea, 495 F.2d 1170, 1173 n.8 (3d Cir. 1974) (finding no prejudice to defendant from external information and noting that "cases will arise where en banc examination [of jurors concerning potential misconduct] is preferable and should be permitted[.]"); United States v. Starks, 515 F.2d 112, 125 (3d Cir. 1975) (finding no abuse
(continued. . .)

In contrast, courts have found that pretrial and post-trial examination of jurors should be held open to the public. See Press-Enterprise I, 464 U.S. at 510 (pretrial voir dire of potential jurors); accord Stewart, 360 F.3d at 98 (same); United States v. Simone, 14 F.3d 833, 840 (3d Cir. 1994) (post trial hearings to investigate juror misconduct); Barber v. Shop-Rite of Englewood & Assocs, Inc., 923 A.2d 286, 291-92 (N.J. Super. Ct. App. Div. 2007) (same).

In Simone, the Third Circuit Court of Appeals applied the experience and logic test to its analysis of post-trial examination of jurors and found no clear history of openness or closure. Simone, 14 F.3d at 838. Accordingly, the court concluded that "on the whole, the 'experience' prong of the 'logic and experience' test provides little guidance in this case." Id. Therefore, Simone "rel[ied] primarily on the 'logic' prong of the [experience and logic] test." Simone, 14

_____

[27](. . .continued) of discretion in refusing to examine jurors in camera regarding potential misconduct, but generally recommending examination outside the presence of other jurors); see also United States v. Addonizio, 451 F.2d 49, 67 (3d Cir. 1971) (discussing examination of prospective jurors and recommending examination outside the presence of other jurors under certain circumstances); Gov't of the V.I. v. Rosado, 699 F.2d 121, 125 (3d Cir. 1983) (same). Therefore, Dowling and its associated cases do not stand for the proposition that midtrial examination of jurors should be held outside the presence of the public because those cases discuss the need to keep juror testimony from other jurors, but do not address the issue of public access. Furthermore, those cases do not establish a tradition of closing proceedings to conduct such an examination, because in each case reviewed by the Third Circuit the examination of jurors or prospective jurors took place in open court.

F.3d at 838. See also United States v. Criden, 675 F.2d 550,
555 (3d Cir. 1982) (finding historical analysis irrelevant, and
examining the issue of first amendment access to pretrial
hearings in terms of the "current role of the [F]irst
[A]amendment and the societal interests in open pretrial
criminal proceedings"); Barber, 923 A.2d at 291-92 ("Given that
there is no absolute right of access to a civil trial and that
there is no history of reported and sanctioned public access to
post-verdict civil jury voir dire concerning juror misconduct,
the first prong of the [experience and logic] test provides
little guidance.") (emphasis added).

In light of Hawai'i's case law and our firmly embedded
general policy of open trials and with very minimal case
authority supporting closure, there is no clear tradition of
either open or closed proceedings when a court conducts a
midtrial examination of jurors regarding potential misconduct.
On the other hand, even assuming there is no tradition of
holding such proceedings in open court, it cannot be said that
there is a tradition in Hawai'i's courts of preventing public
access to midtrial examination of jurors.  Therefore, we
conclude that the experience prong of the "logic and experience"
test provides little guidance in this case and it is appropriate
to give greater weight to the "logic prong" of the tradition and

logic test.  See Simone, 14 F.3d at 838, Criden, 675 F.2d at 555, Barber, 923 A.2d at 291-92.

**b.**

Under the "logic" consideration, the right of the public to attend a criminal proceeding relies on whether "public access plays a significant positive role in the functioning of the particular process in question."  Press-Enterprise II, 478 U.S. at 8.  The United States Supreme Court has identified six "societal interests" that are advanced by open proceedings, all of which are present in this case.  See Richmond Newspapers, 448 U.S. at 569-572; Criden, 675 F.2d at 556 (referring to the considerations under the logic prong as "societal interests").

The first societal interest advanced by public access to criminal proceedings is that access promotes informed discussion of governmental affairs by providing the public with a more complete understanding of the judicial system, serving an "educative" interest.  See Richmond Newspapers, 448 U.S. at 572; id. at 584 (Stevens, J., concurring); id. at 595-96 (Brennan, J., concurring).  A second societal interest advanced by open proceedings is "assurance that the proceedings were conducted fairly to all concerned" thereby promoting a "perception of fairness."  Id. at 569, 570.  Public confidence in and respect for the judicial system can be achieved only by permitting full public view of the proceedings.  Id. at 595 (Brennan, J.,

concurring).  In the case of midtrial examination of jurors, public access to such proceedings would educate the public on the importance of an impartial jury.  Further, an open proceeding would provide assurance that the system is fair to all concerned because it would ensure the public that significant misconduct, if any, is being appropriately addressed and managed.

Parallel to the educational benefits and the assurance of fairness, public access to criminal proceedings also has a "significant community therapeutic value" because it provides an "outlet for community concern, hostility, and emotion." Richmond Newspapers, 448 U.S. at 570-71.  Societal interest in open proceedings is especially high in a newsworthy case where the public has already been following the progress of a proceeding through news reports and other media, or the case otherwise resonates as significant in the community.  Where the public has made a significant investment of interest and attention in a case or proceeding, closing a portion of the proceeding will undoubtedly breed concern and result in unbridled speculation, whereas open proceedings will resolve such concerns.  It is noted that the various circumstances in the present case resulted in significant public attention.

Open proceedings also advance a fourth societal interest by serving as a check on "the misconduct of

participants" by exposing the judicial process to public scrutiny, thus discouraging decisions based on secret bias or partiality.  See id. at 569 (plurality opinion).  The fifth societal interest advanced by public observation is that public access enhances the performance of all involved.  See id. at 569 n.7.  Opening the examination process to public scrutiny assures the public of the integrity of the participants in the system, and elevates confidence in the judicial process by providing greater transparency.  The final societal interest, also implicated in the present case, is that public access to criminal proceedings discourages perjury.  See id. at 596-97 (Brennan, J., concurring).  Public observation of juror examination will discourage perjury because members of the public who might be able to contradict false testimony will not learn of that testimony unless the proceedings are open to the public.

Moreover, there does not appear to be any policy-based justification for an across-the-board denial of the First Amendment right of access to the narrow category of midtrial inquiries into jury misconduct.  It is apparent that in the vast majority of criminal cases a need for a midtrial examination of a juror for potential misconduct will not arise, and only in a small portion of those cases when the need does arise will any of the risks associated with a high profile case involving

extensive media coverage be present.  Thus, a rule automatically allowing closure of trial proceedings for midtrial questioning is neither warranted nor justified in light of the requirements of article I, sections 4 and 14 of the Hawai'i Constitution for a public trial.[28]  Even in a high-profile case, it should not automatically be assumed that midtrial juror questioning will necessarily endanger a defendant's right to a fair and impartial jury.

We also find the reasons set forth in Edwards for its holding that that there is no First Amendment right of the public to attend midtrial questioning to be unpersuasive.  See Edwards, 823 F.2d at 117.  The rationale of the Edwards' decision is based upon the conclusion that an open court proceeding would "substantially raise the risk of destroying the effectiveness of the jury as a deliberative body" because the

---

[28]     An across-the-board rule allowing closure at the presiding judge's discretion would appear to be at odds with the ABA Principles for Juries and Jury Trials.  "Juror voir dire should be open and accessible for public view . . . . Closing voir dire proceedings should only occur after a finding by the court that there is a threat to the safety of the jurors or evidence of attempts to intimidate or influence the jury."  Principals for Juries and Jury Trials, Standard 7(A.1), ABA (August 2005) (available at http://aja.ncsc.dni.us/conferences/2010Annual/SpeakerMaterials/44%20-%20Mize%20ABA%20jury%20principles.pdf, last visited June 17, 2014) (emphasis added).  This standard "acknowledges that established law requires courts to balance the privacy interests of jurors and the rights of litigants and the public when determining whether to keep information touching on the private lives of jurors out of the public domain . . . . [and is] designed to establish a framework within which courts may balance those interests."  Id., cmt.  Although the commentary indicates the standard is focused on jury selection, id., the language of the standard does not restrict its application to pretrial voir dire.

examination places the attorney in conflict with the juror and may create tension between members of the jury panel. Id. However, Edwards' rationale does not explain why a closed proceeding would address this concern. See id. As Simone pointedly observed, the Edwards' court provides "little explanation" for its conclusion that an open hearing would "exacerbate" "[t]he deleterious effects" of the midtrial examination. See Edwards, 823 F.2d at 117; Simone, 14 F.3d at 840.

Furthermore, Edwards undercuts its own holding by acknowledging that balancing the secrecy necessary to guarantee an impartial jury with the public's right of access may not always result in closure: "we do not foreclose the possibility that the [F]irst [A]mendment . . . might require that proceedings involving the questioning of jurors be held in open court." Edwards, 823 F.2d at 117 n.5.[29] Edwards further observes that "The issue of potential juror misconduct goes to the very heart of public confidence in the fairness or

---

[29] However, Edwards' test for a First Amendment challenge—that in order "to sustain a [F]irst [A]mendment challenge, factors must exist to demonstrate that open proceedings would play a 'significant positive role' in the functioning of the particular proceedings in question"—reverses the burden expressed in Press-Enterprise II, because Edwards requires the proponent of open proceedings to demonstrate a significant positive role that open proceedings would play, rather than requiring the proponent of closure to demonstrate a substantial probability of prejudice. See Press-Enterprise II, 478 U.S. at 14 (holding that "the preliminary hearing shall be closed only if specific findings are made demonstrating that . . . there is a substantial probability that the defendant's right to a fair trial will be prejudiced . . . .") (emphasis added).

appearance of fairness in judicial proceedings.  Once the spectre of a tainted jury is raised, <u>public scrutiny of the resolution of the issue is essential</u>[.]"  <u>Id.</u> at 116 (emphasis added).

Edwards, Halverson, and Ivester also present a more fundamental constitutional problem.  If the public's right to access and observe criminal trials can be analyzed and determined out of public view, the public has no opportunity to protect that right.  See Phoenix Newspapers, 156 F.3d at 951 (holding that the constitutional safeguards provide the essential, if not only, means by which the public's voice can be heard).  It may well be that in all three cases there were substantive reasons that secrecy was required for the proper function of the court.  Those reasons could have been articulated as findings, satisfying constitutional requirements.[30]  However, had the courts undertaken to make findings, the public's right of access would have been considered, and a reviewing court would have been able to determine whether the public right had been adequately protected.  These cases did not identify a persuasive logical reason why midtrial examination of jurors to investigate misconduct should allow closure of a courtroom without

---

[30]   For instance, in Ivester, "the court discussed the [jurors' safety concerns] with counsel in open court with the jury absent."  Ivester, 316 F.3d at 957-58.

consideration of the right of access of the public.  On the contrary, Edwards expressly identified a potential First Amendment challenge to closure, thereby explicitly recognizing, at a minimum, a qualified First Amendment interest in that proceeding.

### c.

Therefore, we hold that the qualified right of access to criminal trials under article 1, section 4 of the Hawai'i Constitution is not extinguished by the mere necessity to conduct midtrial examination of jurors to investigate potential juror misconduct.  However, at the same time a defendant's article 1, section 14 right to a fair trial under the Hawai'i Constitution is an overriding interest that may require that such proceedings be held in closed court.[31]  Accordingly, when the overriding interest asserted is the protection of defendant's right to a fair trial, the test proscribed by Press-Enterprise II appropriately balances those competing constitutional interests.  Press-Enterprise II, 478 U.S. at 14.

---

[31]      We are not presented with, and therefore do not address, a situation where a criminal defendant requests that court proceedings remain open.  See Waller, 467 U.S. at 47 n.6 (noting that "[o]ne of the reasons often advanced for closing a trial—avoiding tainting of the jury by pretrial publicity (e.g., [Press-Enterprise I], 464 U.S., at 510) is largely absent when a defendant makes an informed decision to object to the closing of the proceeding."); Ortiz, 91 Hawai'i at 191, 981 P.2d at 1137 (adopting Waller).  Under Ortiz and Waller, a court essentially applies the standard set forth in Press-Enterprise I.  Waller, 467 U.S. at 48; Ortiz, 91 Hawai'i at 191, 981 P.2d at 1137.

That is, the hearing should be "closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights."[32]  Id.

### d.

During the second and fifth proceedings on August 26, 2013, the circuit court closed the courtroom.[33]  The Partial

---

[32]     This test is similar to that prescribed by Gannett Pac. Corp., that in order to close a courtroom the presiding judge must find that there is a "substantial likelihood that an open hearing . . . would interfere with the defendant's right to a fair trial by an impartial jury.  Gannett Pac. Corp., 59 Haw. 233, 580 P.2d at 56-57.  See note 17, supra.  To determine whether a substantial probability exits, the factors from Gannett Pac. Corp. may be helpful, as adapted to the particular situation.

> In determining whether there is such a likelihood, the district judge shall consider [1] the nature of the evidence sought to be presented; [2] the probability of such information reaching potential jurors; [3] the likely prejudicial impact of this information upon prospective veniremen; [4] and the availability and efficacy of alternative means to neutralize the effect of such disclosures.

Gannett Pac. Corp., 59 Haw. at 233-34, 580 P.2d 49, 57.

[33]     We do not address the first, third, and fourth proceedings that were not open to the public because those proceedings took place in chambers or at sidebar and involved questions of procedure rather than the actual questioning of jurors.
      The United States Supreme Court has stated that "when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle."  Richmond Newspapers, 448 U.S. at 598 n.23.  The American Bar Association has expressed that trial judges should endeavor to keep proceedings open to the public.  "The trial judge should maintain a preference for live public proceedings in the courtroom with all parties physically present."  Standard 6.18(a), ABA Standards for Criminal Justice, Special Functions of the Trial Judge, 3d Ed. (2000).  "Although limited matters may be conducted in chambers, public exposure to the criminal process

(continued. . .)

Order to Unseal and the partially unsealed transcript make clear that the circuit court was concerned with protecting the Defendant's Sixth Amendment right to a fair trial, however, the circuit court's intent only became apparent following the issuance, six months later, of the Partial Order to Unseal.  At the time of closure, there was no indication to the Petitioners why the circuit court felt compelled to close the courtroom.  As these two proceedings occurred in court, a qualified right of the public to access the proceedings arose under both the First Amendment and article 1, section 4 of the Hawaiʻi Constitution. Accordingly, the court was obligated to make specific findings articulating the overriding interest that required closure. Press Enterprise I, 464 U.S. at 510.  No contemporaneous articulation was made by the circuit court; therefore, the procedures of the circuit court were insufficient to protect the public's First Amendment and article 1, section 4 rights of access to criminal proceedings.

As the Partial Order to Unseal specifies that the compelling interest relied upon by the circuit court was the Defendant's Sixth Amendment right to a fair trial, the circuit court should have applied the test from Press-Enterprise II to

---

[33](. . .continued)
both fosters the appearance of fairness and impartiality and facilitates the deterrent impact of the criminal justice system."  Id., cmt.

determine if closure was warranted.[34]  That is, the hearing
should be "closed only if specific findings are made
demonstrating that, first, there is a substantial probability
that the defendant's right to a fair trial will be prejudiced by
publicity that closure would prevent and, second, reasonable
alternatives to closure cannot adequately protect the
defendant's fair trial rights.  Press-Enterprise II, 478 U.S. at
14.

The Partial Order to Unseal identified several
interests warranting closure of the courtroom, including the
privacy and security of the jurors and the importance of
preserving an impartial jury to ensure a fair trial on behalf of
both the Defendant and the State.  While these reasons are
indisputable in the generic sense, they do not as stated provide
sufficient justification for a closure of a court proceeding.[35]
Press-Enterprise II, 478 U.S. at 15 ("The First Amendment right
of access cannot be overcome by the conclusory assertion that
publicity might deprive the defendant of that right."); In re
Memphis Pub. Co., 887 F.2d 646, 648 (6th Cir. 1989) (holding

---

[34]     The test from Gannett Pac. Corp. may also have sufficiently
protected the Defendant's right to a fair trial.  See note 32, supra.

[35]     We also note that the belated issuance of the Partial Order to
Unseal is a less effective protection of the public right than would be
contemporaneous findings.  See Waller, 467 U.S. at 49 n.8 ("The post hoc
assertion by the [court] that the trial court balanced the petitioners' right
to a public hearing . . . cannot satisfy the deficiencies in the trial
court's record.").

that "the naked assertion by the district court in this case that defendant's Sixth Amendment right to a fair trial 'might well be undermined,' without any specific finding of fact to support that conclusion, was insufficient to justify closure").

The circuit court indicated in its Partial Order to Unseal that it "must avoid exposing the individual jurors to anything that may in any way improperly influence their continuing decision-making processes." The order suggests that questioning a juror in front of friends and family might "expose a juror to pressure and matters which are not part of the evidence to be considered, [and] also could hamper the Court's search for candid answers from that juror." Id. Therefore, the order concludes that

> in order to preserve a juror's privacy and security and the integrity of a fair and impartial jury decision based solely upon the trial evidence and the law provided by the Court, and to protect the right of both parties to a fair trial and verdict, public access would not play a significant positive role in the functioning of this process.

(Emphasis added).

We do not agree with the circuit court's statement that "public access would not play a significant positive role in the functioning of this process." As expressed by the Supreme Court's recognition of a First Amendment right of public access, the parallel right of access under article 1, section 4 of the Hawai'i Constitution, and our firmly embedded general

policy of open proceedings, public access always has a positive role in the functioning of the courtroom process. Gannett Pac. Corp., 59 Haw. at 228, 580 P.2d at 54. However, when midtrial examination of jurors raises a risk to a defendant's right to a fair trial, the benefits of public access must be balanced against the equally weighty concern for a defendant's fair and impartial jury in determining whether to close the proceedings to the public.

While we do not decide whether the risk of prejudice to the Defendant's rights to a fair trial and an impartial jury outweighed the public's right of access in the present case, we note that it may have been helpful for the circuit court to have considered the factors delineated by Gannett Pac. Corp. in determining whether there was a substantial likelihood that an open hearing would interfere with the Defendant's right to a fair trial by an impartial jury. Gannett Pac. Corp., 59 Haw. at 233, 580 P.2d at 56; see note 16, supra. Specifically, the circuit court may consider the nature of the likely testimony provided by individual jurors, the probability of such information reaching the remaining jurors, and the likely prejudicial impact of this information. Importantly, the court should always consider the availability or efficacy of alternatives to closure that could neutralize the effect of the reach of such prejudicial information. Rather than articulating

generalized statements of policy, a court must make factual findings specific to the circumstances that indicate the substantial likelihood that an open hearing would interfere with the defendant's right to a fair trial by an impartial jury.

### 2.

The question of access to a post-trial transcript of a closed hearing is distinct from the question of access to the hearing.  "The two are not synonymous, for the rationale for closing a proceeding, such as infringement of the defendant's right to a fair trial, may have no bearing on a decision to seal forever the content of in camera proceedings."  Phoenix Newspapers, 156 F.3d at 946-47.  "It would be an odd result indeed were we to declare that our courtrooms must be open, but that transcripts of the proceedings occurring there may be closed, for what exists of the right of access if it extends only to those who can squeeze through the door?"  United States v. Antar, 38 F.3d 1348, 1360 (3d Cir. 1994).  "At the heart of the Supreme Court's right of access analysis is the conviction that the public should have access to information; the Court never has suggested that an open proceeding is only open to those who are able to be bodily present in the courtroom itself."  Id.

**a.**

With respect to the right of access to judicial documents under article I, section 4 of the Hawai'i Constitution, the firmly embedded general policy of openness declared by Gannett Pac. Corp. also applies to the transcript of closed proceedings. "[A] complete record of those parts of the proceedings closed to the public shall be kept and made available to the public for a legitimate and proper purpose following the completion of trial or disposition of the case without trial." Gannett Pac. Corp., 59 Haw. at 235, 580 P.2d at 57; see also Takao, 59 Haw. at 242, 580 P.2d at 63 (finding that no irreparable harm was shown because the transcript was to be made available to the public as soon as the trial was concluded). "Historically, post-trial transcript access has been granted as soon as the factors which prompted hearing closure have been resolved." Phoenix Newspapers, 156 F.3d at 947. Therefore, under the experience prong of the Supreme Court test, precedent requires the release of the transcript once any competing interests that militate for closure of a hearing traditionally open to the public are no longer viable.

The same logical interests that animate the public's right of access to courtroom proceedings also underlie the benefits that result from public access to a transcript of closed proceedings once the danger that precipitated closure has

passed.  Unreasonable delay in the release of a transcript "frustrates[s] the 'community therapeutic value' of openness." Press-Enterprise II, 478 U.S. at 13.  Public access to a transcript of a closed proceeding also "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the criminal justice system." Press-Enterprise I, 464 U.S. at 508.  Further, once the trial is completed, a defendant's article 1, section 14 rights to a fair and impartial jury and public trial under the Hawai'i Constitution are typically no longer concerns, and consequently there would be no logical reason to continue to deny the right of access of the public for the purpose of protecting a defendant's right to a fair trial.

Thus, we hold that a qualified public right of access to a transcript of a closed proceeding is present under both the First Amendment and article 1, section 4 of the Hawai'i Constitution, once the overriding interests that militated for closure of the proceeding are no longer viable.  "Indeed, the denial of the motion to release the transcripts was in itself a denial of the right of access protected by the first amendment." Brooklier, 685 F.2d at 1172.  "It must be tested by the same standard and must satisfy the same procedural prerequisites as the initial closure."  Id.  Therefore, the same procedural and substantive protections that must be observed by a court

considering closure of courtroom proceedings in which the public has a potential qualified right of public access must also be observed if a court is contemplating to deny access to the transcript of the closed proceeding.

If public access to a transcript is to be denied, "a trial judge should explain why the material is entitled to privacy." Brooklier, 685 F.2d at 1172. "[I]f a court contemplates sealing a document or transcript, it must provide sufficient notice to the public and press to afford them the opportunity to object or offer alternatives." Phoenix Newspapers, 156 F.3d at 951. "If objections are made, a hearing on the objections must be held as soon as possible." Phoenix Newspapers, 156 F.3d at 949. The hearing should provide a "meaningful opportunity to address sealing the transcripts on the merits, or to discuss with the court viable alternatives." Id.

Substantively, the trial court is required to make specific findings demonstrating a compelling interest, a substantial probability that the compelling interest would be harmed, and there is no alternative to continued sealing of the transcript that would adequately protect the compelling interest. Id. at 949. The trial court may not rely on "generalized concerns" but must indicate facts demonstrating "a compelling interest justifying the continued sealing of the

hearing transcript."  Id. at 950.  Additionally, the court must "specifically explain the necessary connection between unsealing the transcript" and the infliction of irreparable damage resulting to the compelling interest.  Id. (holding that the refusal to unseal the transcript was in error, as the court did not explain the required connection between unsealing the transcript and irreparable damage to the compelling interest).

Further, only access to those parts of transcript "reasonably entitled to privacy" should be denied.  Press-Enterprise I, 464 U.S. at 513.  Therefore, the "trial judge should seal [] such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected."  Id.

## b.

In the present case, the circuit court did not adequately protect the public's right of access to the transcript of the closed proceedings as guaranteed by article I, section 4 of the Hawai'i Constitution.  The transcript of the August 26, 2013 proceedings was sealed and public access was denied until February 24, 2014, some six months after the mistrial was declared.  Based on the brevity of the questioning of the juror in the second and fifth proceedings and the fact that the court allowed the juror to continue deliberating, the circuit court was apparently convinced that the handshake at

issue did not present a serious risk of a biased jury or raise substantial issues of juror misconduct. Therefore, the transcript of the closed proceedings should have been unsealed as soon as practicable once the court allowed the jurors to resume deliberations, with appropriate redaction of any inappropriate statement about the subject matter of the deliberations and personal identifiers of the involved jurors.

Further, at the close of the proceedings on August 26, 2013, the jury reported that they were deadlocked and the circuit court declared a mistrial. Thus, any potential harm of intrusion into jury deliberations as a result of the court's investigation had clearly passed when the mistrial was declared, again militating for the immediate release of the transcript.

Juror privacy was never at risk by the release of the transcript. As the unsealed transcript demonstrates, redacting personal identifiers or replacing any identifying information with a juror-number generally strikes the quintessential balance between preserving juror privacy and allowing public access to review trial proceedings for fairness and impartiality. Therefore, under the circumstances of this case, the transcript of the closed proceeding should not have remained sealed on the basis of protecting juror privacy or security.

In denying public access to the transcript, the circuit court did not apply the same procedural and substantive

requirements as would be required to close a courtroom. The circuit court was required to provide notice regarding its intention to deny access to the transcript and to hold a hearing allowing objections and alternatives to be presented if any person wished to be heard. The circuit court was further required to make specific findings on the record: (1) identifying the compelling interest that would be harmed by public access to the transcript, (2) demonstrating that a substantial risk of harm to the compelling interest would occur due to public access to the transcript, and (3) identifying any alternatives to denial of public access that the court considered but found insufficiently protective.

Accordingly, the public's qualified right of access to the transcript of the five proceedings on August 26, 2013, was not adequately protected at the time the circuit court sealed the transcript because the circuit court did not observe the procedural and substantive steps necessary to ensure public access was adequately considered in accordance with constitutional requirements. Further, the circuit court improperly continued to deny access to this transcript when the potential risk of harm to any compelling interests that had precipitated closure had passed.

## IV.   Conclusion

The writ of prohibition is dismissed as moot because the circuit court has already unsealed the transcript of the closed proceedings of August 26, 2013, except for appropriate redactions as to juror identification.  The writ of mandamus is denied as unnecessary in light of the directive of this opinion.

In summary, article 1, section 4 of the Hawai'i Constitution provides the public a qualified right of access to observe court proceedings of criminal trials.  In keeping with our firmly embedded policy of open trials, the circuit court, and all Hawai'i courts conducting criminal proceedings involving adult defendants, are directed to refrain from closing trial proceedings that are presumptively open to the public.[36]  The presumption of openness may be overcome only by an overriding interest.  The court must set forth specific findings demonstrating the closure is essential to preserve the overriding interest, and the closure is narrowly tailored to serve that interest.  Press-Enterprise I, 464 U.S. at 510.

Additionally, public access to a transcript of a closed proceeding must be given the same protections as a courtroom proceeding.  Brooklier, 685 F.2d at 1172.  A

---

[36]   As noted, see note 17, supra, "the reasons underlying openness in the criminal context, as enunciated in [Gannett Pac. Corp.], are equally compelling in the civil context."  Campbell, 106 Hawai'i at 462, 106 P.3d at 1105.

transcript of those parts of the proceedings closed to the public must be made available to the public once the danger to the compelling interest has passed.  Gannett Pac. Corp., 59 Haw. at 235, 580 P.2d at 57; Takao, 59 Haw. at 242, 580 P.2d at 63; Phoenix Newspapers, 156 F.3d at 947-48.

However, a defendant's right to a fair and impartial jury is a compelling interest that may outweigh the general policy of openness and public access guaranteed by article 1, section 4 of the Hawai'i Constitution.  A defendant's right to a fair and impartial jury may be implicated if the court is considering conducting midtrial questioning of jurors in order to investigate potential misconduct.  In such a situation, the responsibility of the court is to make "specific findings . . . demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights.  Press-Enterprise II, 478 U.S. at 14.  In determining whether there is such a substantial probability, the judge may consider: the nature of the likely risk to the defendant's right to an impartial jury; the probability of such risk impacting the jurors impartiality; the likely prejudicial impact of the risk; and, the availability and efficacy of alternative means to neutralize the effect of the

reach of such risk.  Gannett Pac. Corp., 59 Haw. at 233–34, 580 P.2d at 57.


Jeffery S. Portnoy and          /s/ Mark E. Recktenwald
John P. Duchemin
for petitioners                 /s/ Paula A. Nakayama



Robyn Chun and                  /s/ Richard W. Pollack
Charleen M. Aina
for respondent judge            /s/ Robert M. Browning

Janice T. Futa,                 /s/ Edward H. Kubo
Brook Hart,
Margaret C. Nammar, and
Thomas M. Otake
for respondents

Robert Brian Black
for amici